SOUTHWEST FLORIDA WINTER VEG-
ETABLE GROWERS ASSOCIATION;
Palm Beach-Broward Farmers Commit-
tee for Legislative Action, Inc., and
South Florida Tomato and Vegetable
Growers, Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

and

West Mexico Vegetable Distributors
Association, Intervenor.

Court No. 80–4–00577.

United States Court of
International Trade.

March 21, 1984.

Van Ness, Feldman, Sutcliffe, Curtis & Levenberg, P.C., Washington, D.C. (Gerry Levenberg, P.C., Gary D. Bachman, and Jeffrey S. Christie, Washington, D.C., on the motion), for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div. (Alexander Younger, Senior Trial Counsel, Washington, D.C., on the cross-motion); (William D. Hunter, Atty. Adviser, Office of the Gen. Counsel, Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel, on the cross-motion), for defendant.

Arnold & Porter, Washington, D.C. (Patrick F.J. Macrory, Kenneth A. Letzler, Bijan Amini, and John M. Campbell, Washington, D.C., on the motion), for intervenor.

## OPINION AND ORDER

CARMAN, Judge:

This matter is before me on plaintiffs' motion for review of administrative determinations upon an agency record filed pursuant to Rule 56.1 of the Rules of this court, challenging the Final Determination of Sales at Not Less Than Fair Value by the Department of Commerce (Commerce) in the antidumping investigation concerning certain fresh winter vegetables from Mexico, 45 Fed.Reg. 20,512 (March 28, 1980). Plaintiffs argue this determination by Commerce was unsupported by substantial evidence in the record and otherwise was not in accordance with law.

This case presents a novel issue of whether Commerce may disregard a substantial number of below cost sales, reflecting the perishable nature of produce, in determining whether sales were made at less than fair value under our antidumping laws. It is an important determination not only to the parties to this action but to the domestic and Mexican produce industries as a whole. The procedural history of the case is undisputed and follows here.

Plaintiffs filed a petition with the United States Treasury Department (Treasury) on September 12, 1978, alleging certain fresh winter vegetables—tomatoes, squash, eggplant, bell peppers and cucumbers—were imported from Mexico between November 1, 1977, and April 30, 1978, and were being sold in the United States at less than fair value within the purview of Section 201 of the Antidumping Act of 1921, as amended, ch. 14, § 201, 42 Stat. 9, 11 (repealed 1979). The petition of plaintiffs alleged that Southern Florida and the State of Sinaloa, Mexico, provided the source of virtually all fresh winter vegetables for markets in the United States and that Nogales, Arizona, was the point of importation for over 95 percent of all winter vegetables from Mexico.

After many extensions from the commencement of the antidumping investigation on October 19, 1978, Treasury issued on November 5, 1979, a Tentative Determination of Sales at Not Less Than Fair Value. 44 Fed.Reg. 63,588 (1979). Subsequently, the antidumping investigation was transferred to Commerce on January 1, 1980.[1] Commerce continued the investigation after having determined that the transition rules of the Trade Agreements Act of 1979, Pub.L. No. 96–39, §§ 102–107, 93 Stat. 189, covered investigations of less than fair value sales in which a tentative negative determination had been made by Treasury prior to the effective date of the 1979 Act.[2] Treasury's preliminary negative determination was treated as though it had been issued by Commerce on January 1, 1980, under Section 733 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673b (1982).

On March 24, 1980, Commerce issued a Final Determination of Sales at Not Less Than Fair Value pursuant to Section 735 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1673d (1982). See 45 Fed.Reg. 20,512 (1980).

Plaintiffs argue the determination by Commerce that the subject merchandise was not being, and was not likely to be, sold in the United States at less than fair value is unsupported by substantial evidence in the record and is not in accordance with the law. Plaintiffs' contentions in essence are: (1) Commerce erred in using the third country sales methodology rather

**1.** The antidumping provisions of the Trade Agreements Act of 1979, 19 U.S.C. § 1673–1675 (1982), became effective on January 1, 1980, repealing and replacing the Antidumping Act of 1921, see 19 U.S.C. § 1671 note (1982). The administration of the antidumping laws was transferred from the Department of Treasury to the Department of Commerce by Reorganization Plan No. 3 of 1979, 44 Fed.Reg. 68,273 (1979), made effective as of January 2, 1980 by Exec. Order No. 12,188, 45 Fed.Reg. 989 (1980).

**2.** Section 102(b)(2) of the Trade Agreements Act of 1979, Pub.L. No. 96–39, 93 Stat. 189 (codified at 19 U.S.C. § 1671 note (1982)), provides in pertinent part:

If the Secretary has made ... a preliminary determination, but not a final determination, that imports ... are being or are likely to be sold ... at less than fair value, the investigation shall be terminated and the matter previously under investigation shall be subject to

the provisions of title VII of the Tariff Act of 1930 ... as if the preliminary determination under the Antidumping Act, 1921, ... were a preliminary determination under Section 733
....

*Id.* There had been some doubt as to whether the Act covered tentative negative determinations. The House Report on the 1979 Act, however, indicates congressional intent that all tentative determinations be covered by the transition rules. The House Report states: "With respect to pending antidumping and countervailing duty investigations, the last determination made under the old law will be treated as having been made under new law and the time limits and procedures of the new law will subsequently apply." H.R.Rep. No. 317, 96th Cong., 1st Sess. 78. The Senate Report reflects a similar intent. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 102, *reprinted in* 1979 *U.S.Code Cong. & Ad.News,* 381, 488.

than the constructed value methodology in determining foreign market value because a substantial number of third country sales at below cost existed making the valuation inaccurate; (2) Commerce improperly refused to disregard a substantial amount of below cost sales in contravention of 19 U.S.C. § 1677b(b); (3) Commerce made "adjustments" directly to the price differentials produced by the third country sales comparisons that were not authorized by 19 U.S.C. § 1677b(a)(4), nor was there substantial evidence to support the "adjustments"; and, (4) Commerce's use of "regression analysis" to determine whether sales in the United States were at prices less than the established foreign market value is not authorized by 19 U.S.C. § 1677b(f).

Defendant has responded to plaintiffs' arguments, noting: (1) the 1979 Act establishes a general preference for the use of third country sales over constructed value; (2) the decision to include up to 50 percent below cost sales is supported by uncontroverted evidence and is authorized by statute; (3) "adjustments" were not made to the dumping margins or to any other figures for either quality, ripeness or time of day of sale; and, (4) regression analysis is a widely accepted statistical test and was appropriate in this case.

With respect to the regression analysis issue, intervenor built a record on this issue by submitting the views of four eminent authorities in statistics and econometrics. Intervenor supported the use of regression analysis arguing at the administrative level, as well as before this court, that it is the best tool to analyze the enormous number of individual transactions in fresh vegetables in light of extremely rapid price fluctuations and the variations in price caused by differences in ripeness and quality.

Plaintiffs have the burden of establishing that the administering authority's determinations are unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982). "Substantial evidence" has been characterized by the Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). A discussion of each of plaintiffs' contentions follows here.

### I. Methodology Employed

■ To determine whether sales at less than fair value occurred, Commerce had to calculate the "fair value" [3] of the subject merchandise pursuant to the procedures specified for determining foreign market value. *See* 19 U.S.C. § 1677b (1982). Three methods are available for this calculation: (1) the sales price of the merchandise in the country of export (home market sales), *id.* § 1677b(a)(1)(A); (2) the sales price of the merchandise in a country other than the United States (third country sales), *id.* § 1677b(a)(1)(B); or, (3) the "constructed value" of the merchandise (sum of

**3.** In the administration of the antidumping laws, certain working "definitions" and terms have developed and which are set forth below for convenience.

(1) *Fair Value:* The term "fair value," while not defined by statute, was intended to be an estimate of foreign market value. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 59 (1979); 19 C.F.R. § 353.1 (1983). Antidumping duties are collected on sales to the United States when the price in the United States is less than the foreign market value and where the required injury determination has been made. 1 H. Kaye, P. Plaia, Jr., and M. Hertzberg, *International Trade Practice* § 28.12 (1982). The foreign market value is the value in the home market which is contrasted with the United States price to ascertain whether dumping margins exist. *Id.* § 28.-13;

(2) *United States Price:* "[T]he term 'United States price' means the purchase price or the exporter's sales price, of the merchandise, whichever is appropriate." 19 U.S.C. § 1677a(a) (1982);

(3) *Purchase Price:* " '[P]urchase price' means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from the manufacturer or producer of the merchandise for exportation to the United States. Appropriate adjustments for costs and expenses ... shall be made if they are not reflected in the price paid by the person by whom, or for whose account, the merchandise is imported." 19 U.S.C. § 1677a(b) (1982).

costs for material, fabrication, general expenses and profit), *id.* § 1677b(a)(2).

■ Before 1979, the third country sales methodology instead of constructed value methodology was required by statute where the home market sales methodology was not available. *See* Antidumping Act of 1921, ch. 14, § 205, 42 Stat. 9, 13 (repealed 1979). Although the mandatory preference for third country sales is no longer required, the legislative history and relevant regulations indicate, nevertheless, a preference for third country sales where there is adequate confirmation subject to timely verification. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 76; S.Rep. No. 249, 96th Cong., 1st Sess. 76, *reprinted in* 1979 *U.S. Code Cong. & Ad.News* 381, 488; 19 C.F.R. § 353.4(b) (1983). The criteria employed in selecting the third country sales methodology are in order of significance: similarity of product, volume of sales, and similarity of market from an organizational and development point of view. 19 C.F.R. § 353.-5(c).

If Commerce is unable to establish foreign market value based on home market prices (e.g., where there is no home market) or upon third country sales (e.g., where there is inadequate information that can be verified within the time required), then the constructed value methodology may be employed. 19 U.S.C. § 1677b(a)(2).[4]

■ In this case, the home market sales methodology was not employed because an insufficient domestic Mexican market existed for fresh winter vegetables. Commerce utilized the third country (Canada) sales method of comparison instead of the constructed value method noting the general preference for third country sales and its greater accuracy in the case at hand. Furthermore, as noted by Commerce, use of constructed value would be wholly unsuitable to the economic realities presented in this case. A principal characteristic of the fresh winter vegetable market is wide price fluctuations, both within a day and over the season. As the Commerce determination reflects, it is a necessary practice for many individual sales to be below the average cost of production. Profitability depends on sales over the course of a season. The use of a price arrived at by constructed value would necessarily give the appearance of dumping even though sellers would be acting in a normal, indeed in a necessary, manner in light of industry demands. Thus, the constructed value methodology is inappropriate because it would require finding that an economically necessary business practice is unfair. As the Senate Report noted: "[T]hird country prices will normally be preferred over constructed val-

---

**4.** 19 U.S.C. § 1677b(a)(2) provides:

If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise may be the constructed value of that merchandise, as determined under subsection (e) of this section.

*Id.* The determination of constructed value of imported merchandise is the sum of

the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of

that particular merchandise in the ordinary course of business;

an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made up by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, except that—

the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and

the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost; and

the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise under consideration in condition, packed ready for shipment to the United States.

19 U.S.C. § 1677b(e) (1982).

ue if presented in a timely manner and if adequate to establish foreign market value." S.Rep. No. 249, *supra*, at 94.

Plaintiffs argue that third country price data in this case is inadequate for the fair value comparison because of the presence of price volatility and the existence of a significant number of sales below the cost of production. This court cannot agree.

First, the proportion of Canadian sales to United States sales (i.e., Canadian sales are approximately 20 percent of United States sales) affords an adequate basis for comparison in using third country sales and is within established administrative guidelines.[5] Second, plaintiffs conceded in their administrative petition that the two markets are almost identical. And third, the record reflects substantial evidence to support the conclusion of price equality.

Furthermore, plaintiffs' contention that constructed value should have been utilized because (1) some growers had too few or no Canadian sales; (2) on some days, growers had sales to the United States, but none to Canada; and, (3) some growers had insufficient above-cost sales to Canada, is without merit. There is no support for the proposition that Commerce was required to utilize constructed value for those transactions that could not be matched with United States transactions for the same grower's product, size and day.

Based on the general preference for the use of third country sales over constructed value, and the existence of adequate data for third country sales, this court cannot find Commerce erred in its use of this methodology.

## II. Treatment of Below Cost Sales

In the case at hand, Commerce concluded that "it would be appropriate to disregard below-cost Canadian sales only if such sales constituted 50 percent or more of a grower's total sales to Canada of the type of produce under consideration." 45 Fed.

Reg. at 20,515 (1980). Plaintiffs argue this 50 percent benchmark resulted in the erroneous consideration of a significant number of below cost sales in the determination by Commerce of foreign market value. Neither the statute nor its legislative history, however, supports this contention by plaintiffs.

In the determination of foreign market value, 19 U.S.C. § 1677b(b) provides in part as follows:

Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales made at less than cost of production—

(1) have been made over an extended period of time and in substantial quantities, and

(2) *are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade,*

such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value ... the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.

*Id.* (emphasis added). Commerce is required to disregard below cost sales only when they have been made in substantial

---

**5.** *See Cumene from the Netherlands,* 43 Fed.Reg. 57,370 (1978) (third country sales equal to 9 percent of U.S. sales were held sufficient); *Certain I-Beams from Belgium,* 44 Fed.Reg. 54,579 (1979) (home market sales equal to 6 percent of U.S. sales held adequate); *see also Silver Reed America, Inc. v. United States,* 581 F.Supp. 1290 at 1297, 7 CIT —— at —— (1984).

quantities over an extended period of time, and are not at prices that permit recovery of all costs within a reasonable period of time in the normal course of trade. As legislative history reflects, "[s]tandards would not require the disregarding of below-cost sales in every instance, for under normal business in both foreign countries and the United States, it is frequently necessary to sell obsolete or end-of-model year merchandise at less than cost.... [I]nfrequent sales at less than cost, or sales prices which will permit recovery of all costs based upon anticipated sales volume over a reasonable period of time would not be disregarded." S.Rep. No. 1298, 93d Cong., 2d Sess. 173, *reprinted in* 1974 *U.S.Code Cong. & Ad.News* 7186, 7310.

■ Commerce found that the fresh winter vegetable markets, in contrast to markets for industrial products or agricultural products with a relatively longer shelf life, normally experience below cost sales, and such sales are common and expected. *See* Plaintiffs' Exhibit 72, at 6 (statement in Affidavit of Professor Robert S. Firch) [6].

Commerce determined that Mexican producers do not have the ability to control their short term output and cannot store their products. They look to make profits over the season as a whole, and do not expect to recover full costs on individual sales. The record reflects that it is not uncommon for some sales by foreign and domestic producers of fresh winter vegetables to be as much as 50 percent below the cost of production.

In short, the statute permits the consideration of below cost sales made in the normal course of trade at prices that permit full cost recovery within a reasonable period of time, and there is substantial evidence in the administrative record to support Commerce's determination that below cost sales in this case up to 50 percent were made in the normal course of trade and at prices that permit full cost recovery

within a reasonable period of time. Commerce, therefore, properly regarded the below cost sales in its determination of foreign market value.

### III. Adjustments

■ Plaintiffs argue adjustments made by Commerce were in violation of the law and unsupported by substantial evidence in the record. Plaintiffs contend: (1) adjustments under 19 U.S.C. § 1677b(a)(4) may be made only to foreign market value and not to dumping margins generated after fair value comparisons; (2) adjustments under 19 U.S.C. § 1677b(a)(4) may be made to foreign market value only when they are quantifiable; and, (3) the adjustments made relating to ripeness, quality and time of day of sale are unsupported by substantial evidence.

First, plaintiff has loosely and inaccurately used the term "adjustments." The only adjustments made by Commerce in the final determination were those, whenever applicable, for brokers' and distributors' commissions, U.S. Customs duties and charges (comparable adjustments were made to find the Canadian price), U.S. Department of Agriculture inspection fees, U.S. and Mexican Customs house brokerage, freight to Nogales, Mexican export duty and charges, and growers association fees and charges. 45 Fed.Reg. at 20,515. Secondly, these adjustments were properly authorized by statute.

With respect to factors that are characteristic of the market, that is, quality, ripeness, and time of day of sale, the record reflects substantial evidence to support the proposition that these factors affect price. Furthermore, there is no indication in the record that any "adjustments" were made by Commerce other than those authorized by statute.

Commerce determined that the United States and Canadian markets for fresh win-

**6.** Robert S. Firch has been a Professor of Agricultural Economics at the University of Arizona since 1962, and received a Ph.D. in economics from the University of Chicago in June, 1963. Professor Firch has studied the production and marketing of fresh winter vegetables from Mexico since 1965, and is a co-author of a study on this industry entitled, "An Economic Study of the Winter Vegetable Export Industry of Northwest Mexico" (1968) (unpublished manuscript).

ter vegetables are essentially the same, and this point has been conceded by the plaintiffs. The pattern of price movement during a season in the United States and Canada is the same, and prices in the combined United States and Canadian markets reflect aggregate supply and demand. Significant daily price fluctuation occurs because of factors such as the quality of produce, its color or ripeness, the time of day of sale, and expected shelf life. In addition, price takes into consideration bruises and other quality factors that affect the desirability of the produce. Commerce noted that the farther away from the point of distribution, the greater the demand is for less ripe products of high quality that will withstand several days of transportation. Therefore, produce of inferior quality, or near full ripeness, is typically sold to buyers near the point of distribution and because ripe products will not survive several days of transportation, the price is lower. Accordingly, Canada does not present a viable market for low quality or very ripe produce because it is too far from the point of distribution.

The record supports the proposition that quality, ripeness and time of day of sale strongly affect the price, handling and destination of the vegetables at issue. *See* Plaintiffs' Exhibits 73, 74, 75 (Reports of Investigation).

Therefore, having determined the record supports the proposition that quality, ripeness and time of day of sale strongly affect price, and that any adjustments made were authorized by statute and not made directly to dumping margins, this court cannot find merit in the contention of plaintiffs.

## IV. Regression Analysis

█ To confirm further the lack of price discrimination between the United States and the Canadian markets, Commerce implemented a widely accepted statistical procedure known as an F-test based upon regression analysis.

Regression analysis is a statistical technique used to determine whether two variables are linearly related. In the case at hand, the technique was used to determine whether prices of identical vegetables sold under similar circumstances were identical in the United States and Canada. The results of the regression analysis indicated that the linear relationships between the United States and Canadian prices were consistent with price equality and hence corroborated the conclusion that there was no price discrimination between United States and Canadian markets.

Plaintiffs urge that the statistical method of regression analysis tends to obscure the extent and magnitude of sales made at less than fair value by seeking an average linear relationship between sales made at less than fair value and sales made at not less than fair value. This court finds this contention of plaintiffs without merit.

First, the final determination indicated that regression analysis was used to determine the relationship between the sales prices in the two countries, not sales made at less than fair value, and, second, there was no averaging.[7]

There was a lack of refinement of invoice data because of the volume of sales and the numerous producers of fresh winter vegetables from Mexico. Given the statutory requirement that price comparisons be made only for similar produce sold under similar circumstances, 19 U.S.C. § 1677b, and the inadequacy of the standard recordkeeping practices of the industry for precise quantification, regression analysis was a useful technique employed by Commerce to confirm its findings.[8] It was clearly the intention of Congress to give Commerce great flexibility at the fair value stages of its investigation.[9] Utilization of the regression analysis technique to compare sales

---

7. It is noted with interest that plaintiffs argued at the administrative level in its February, 1980 brief, that the regression analysis technique should be employed.

8. *See* II Stipulation Regarding Contents of Computer Tape, at 526; 45 Fed.Reg. at 20,516.

9. *See* F.W. Myers & Co. v. United States, 72 Cust.Ct. 219, 240, 376 F.Supp. 860, 878 (1974).

**18**

transactions enabled Commerce to account for variations of color or ripeness, the time of day of sale and the quality of produce while gauging whether there was an indication of price discrimination in sales made in the market of the United States or Canada.[10]

Regression analysis as a statistical technique is not a new analytical method[11] nor was its use inappropriate in this case, and this court finds its use by Commerce in accordance with the law.

■ Finally, plaintiffs throughout their memoranda appear to urge that the emergence of competing national policy concerns by different executive departments resulted in the exertion of improper political influence upon Commerce, which had a significant effect upon the negative final determination. To set aside an administrative decision on the grounds of improper political pressure upon the Secretary, two elements must be proven. "[T]he content of the [improper political pressure must be] designed to force him to decide the issues upon factors not made relevant by Congress in the applicable statute.... Second, the Secretary's determination must be affected by those extraneous considerations." *Sierra Club v. Costle,* 657 F.2d 298, 409 (D.C.Cir.1981). There has been no showing by plaintiffs either that pressure was exerted to decide the case on nonrelevant facts or that the determination by Commerce was directly affected by political concerns. Absent the above showing, plaintiffs' contention must be dismissed.

### SUMMARY

The antidumping laws give the Department of Commerce broad flexibility in making fair value determinations. H.R.Rep. No. 317, *supra,* at 59; *see Kleberg & Co. v. United States,* 21 CCPA 110, 115, 71 F.2d 332, 335 (1933) (citing *United States v. Central Vermont Railway Co.,* 17 CCPA 166, 172 (1929)). Commerce utilized this

10. *See* 45 Fed.Reg. at 20,516.

11. *See e.g., Vuyanich v. Republic Nat'l Bank,* 723 F.2d 1195, 1201 (5th Cir.1984) (employment dis-

discretion with reasonable basis in fact reflecting the unique characteristic of perishability in the produce industry. Commerce's decision to include below cost sales up to a 50 percent benchmark, although unusual, is supported by substantial evidence in the record and is in accordance with the law.

Therefore, for the reasons stated above, defendant's cross-motion for judgment affirming Commerce's Final Determination of Sales at Not Less Than Fair Value is granted.

Judgment will enter accordingly.

crimination); *Wade v. Mississippi Cooperative Extension Serv.,* 528 F.2d 508, 517 (5th Cir.1976) (employment discrimination).