**GMN GEORG MULLER NURNBERG AG, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**The Torrington Company, Defendant–Intervenor.**

**Court No. 89–06–00355.**

United States Court of International Trade.

April 26, 1991.

Grunfeld, Desiderio, Lebowitz & Silverman, Bruce M. Mitchell, Max F. Schutzman, David L. Simon and Mark E. Wojcik, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ.Div., U.S. Dept. of Justice, Jeanne E. Davidson (John D. McInerney, Senior Counsel, Douglas S. Cohen, Craig R. Giesse, Diane McDevitt, Stephanie J. Mitchell and Maria Solomon, Atty.-Advisors, Office of the Chief Counsel for Import Admin., Dept. of Commerce, of counsel), Washington, D.C., for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Geert de Prest, for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiff, GMN Georg Muller Nurnberg AG ("GMN"), instituted this action to contest the results of an affirmative antidumping determination by the United States Department of Commerce, International Trade Administration ("Commerce" or "ITA"). *Final Determinations of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany*, 54 Fed. Reg. 18,992 (May 3, 1989). The case is presently before the Court on plaintiff's motion, pursuant to Rule 56.1 of the Rules of this Court, for judgment upon the agency record.

Specifically, GMN challenges Commerce's decision to dispense with the standard data reporting procedures. Because the sales data is used to effect fair value comparisons, plaintiff maintains that omissions in reporting will distort the fair value calculation. GMN acknowledges that the tremendous number of transactions involved in this investigation required the use of some type of simplified reporting method; however, it maintains that Commerce's authority to base determinations on less than all transactions is founded exclusively upon 19 U.S.C. § 1677f-1

(1988). This sampling statute, plaintiff argues, specifically requires the use of a generally recognized sampling technique and does not sanction the application of alternative methodologies, such as that adopted by Commerce herein.

GMN's concern is rooted in its belief that the methodology adopted by Commerce excludes from the fair value calculation a significant portion of U.S. sales which do not have an identical sales match in the home market. Moreover, since its sales were relatively few, plaintiff maintains, *all* should have been examined rather than selectively comparing transactions involving identical merchandise sold in both the United States and the home market. At least in its case, claims GMN, a determination based on examination of anything less than one hundred percent of its U.S. sales is unfair and unrepresentative.

Commerce and defendant-intervenor, The Torrington Company ("Torrington"), join to oppose plaintiff's motion, averring that the breadth of this investigation coupled with statutorily imposed time restrictions necessitated a departure from the standard reporting practices. Furthermore, Commerce notes that nothing in the statutory framework requires it to examine *every* transaction during the period of investigation, "[n]or has Congress ever indicated that Commerce must use a particular format." *Defendant's Second Memorandum in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* at 19. Therefore, defendant argues that pursuant to 19 U.S.C. § 1673e(a)(3) (1988), and by regulation, 19 C.F.R. § 353.38 (1988), it possesses authority to choose what proportion of all transactions are to be considered. *Id.* Given the circumstances of this investigation, Commerce notes, it was reasonable for it to adopt a reporting technique that would help "reduce the burden" of examining hundreds of thousands of transactions while still fulfilling the statutory requirements of the antidumping laws within the prescribed time scheme.

Upon review of the caselaw and the evidence on record, it is the Court's opinion that Congress confers upon Commerce considerable discretion in conducting less than fair value ("LTFV") investigations. Since plaintiff has not shown Commerce's alternative procedures for effecting fair value comparisons to be an abuse of said discretion, or otherwise not in accordance with law, the ITA's implementation of alternative sales data reporting requirements for use in comparison of GMN's U.S. and home market sales is affirmed.

### Background

The record reveals that on March 31, 1988, Torrington filed with the ITA a petition, on behalf of the domestic industry, requesting an antidumping investigation of antifriction bearings ("AFBs") (other than tapered roller bearings), and parts thereof, imported from, among other places, the Federal Republic of Germany. Administrative Record ("AR") (Pub.) Doc. 1. The ITA responded by announcing its intention to commence an investigation of AFB imports from Germany covering the period between October 1, 1987 and March 31, 1988. *Initiation of Antidumping Duty Investigation; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 53 Fed.Reg. 15,073 (April 27, 1988). Before the ITA selected which importers would be required to participate in the investigation, GMN, a German producer of AFBs, volunteered to respond to Commerce's questionnaires. The ITA determined that GMN was indeed a proper respondent and included it in all subsequent proceedings.

Soon after the investigation's inception, it became apparent that due to the enormous volume and complexity of the transactions involved, the ITA would have to dispense with the standard sales reporting procedures in order to complete the investigation in a timely manner. Consequently, the ITA proposed several alternative reporting schemes and solicited from the parties comments on each.

Option 1 proposed by the ITA required that:

If the number of U.S. sales having identical home market matches is substantial (at least 33 percent by volume), respondent would be required to report *all* U.S. sales, but *only* those home market sales of products *identical* to those sold in the United States. No similar comparisons would be required. The Department would still require a full technical description of each bearing sold in the home market (or third country, as appropriate) to verify that the appropriate merchandise has been reported in the sales listing.

If there are not identical matches for at least 33 percent by volume of the products sold in the United States, respondent would list the remaining U.S. products in descending order by volume. From that list, respondent would report similar home market matches, starting with the largest volume U.S. product and continuing down the list sequentially. This process would continue until identical and similar product matches are provided for at least 33 percent coverage of the U.S. products.

Option 2 provided that:

Respondent would be required to provide a detailed list to the Department, within one week of [the ITA's] request, identifying *each* product sold in the United States. From that list, [the ITA] would randomly select bearings for analysis and notify respondent(s) of [its] selection. The respondent would then be required to report all U.S. sales of those selected bearings, plus the home market (or third country) sales of the identical or most similar product.

AR (Pub.) Doc. 105 (emphasis in original).

In contrast to Option 2, which would measure sales at less than fair value by comparing sales of randomly selected AFB models sold in the United States with sales of such or similar merchandise in the home market (or third country), Option 1 would determine the existence of less than fair value sales solely on the basis of the comparison of sales of *identically matched* AFBs in both markets provided such sales could be shown to account for at least thirty-three percent by volume of the respondent's sales in the United States. Not surprisingly, given the random nature of Option 2, most respondents including plaintiff, favored Option 1. Torrington, on the other hand, claimed that Option 1 would tend to diminish margins and argued vehemently against its implementation.

After considering the parties' comments, Commerce ultimately elected to adopt Option 1 and respondents were instructed to supply sales data accordingly. AR (Pub.) Doc. 141. GMN and several other respondents who had expressed a desire to provide complete data on all sales were instructed to segregate their data submissions in conformity with Option 1. *Id.*

On May 3, 1989, the ITA published the final results of its antidumping investigation of AFBs from Germany. 54 Fed.Reg. 18,992. Therein, Commerce estimated GMN's weighted average dumping margin to be 35.43%. 54 Fed.Reg. at 18,997. Following the ITA's LTFV determination, the International Trade Commission rendered an affirmative injury determination and an antidumping duty order covering GMN's imports was issued. *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany*, 54 Fed. Reg. 20,900 (May 15, 1989).

### Discussion

■ At the outset, it is well to reiterate that the standard of review applicable to Commerce's determination is not *de novo*. This court is statutorily required to affirm any determination that is supported by substantial evidence on the record, and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is recognized as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed Cir.1984) (quoting *Consolo v. Federal Maritime Comm'n*, 383

U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938).

This restricted standard of review is reflective of the legislative intent that courts afford considerable deference to Commerce's expertise in administering the antidumping law. *United States v. Rutherford,* 442 U.S. 544, 553, 99 S.Ct. 2470, 2475, 61 L.Ed.2d 68 (1979); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Smith–Corona Group, Consumer Prods. Div., SCM Corp. v. United States,* 713 F.2d 1568, 1582 (FedCir.1983); *Hercules, Inc. v. United States,* 11 CIT 710, 748, 673 F.Supp. 454, 485 (1987); *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404, 636 F.Supp. 961, 965 (1986). Our courts have taken this premise one step further by consistently acknowledging that the deference granted to the agency's interpretation of the statutes it administers extends to the methodology it applies to fulfill its statutory mandate. *E.g., Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir1986); *Melamine Chems., Inc. v. United States,* 732 F.2d 924, 928 (Fed.Cir. 1984); *Ceramica Regiomontana,* 10 CIT at 404, 636 F.Supp. at 966.

The proper role of this court, then, is "to determine whether the methodology used by the ITA is in accordance with law," and as "long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana,* 10 CIT at 404–05, 636 F.Supp. at 965–66 (citations omitted).

In the course of antidumping investigations, the law requires Commerce to compare U.S. sales of the merchandise at issue with home market sales of "such or similar merchandise" in order to determine the existence, if any, of sales at less than fair value. 19 U.S.C. § 1673 *et seq.* (1988). In the current international trade environment, where producers vigorously compete for a share of our domestic markets, these investigations often encompass hundreds of thousands of complex transactions, thereby making Commerce's task burdensome, if not impracticable. Congress has recognized this difficulty and has attempted to alleviate this burden by providing the agency considerable flexibility in the fair value stage of the investigation. H.R.Rep. No. 96–317, 96th Cong., 1st Sess. 59, 1979 U.S.Code Cong. & Admin.News 381, 445 (1979).

Specifically to allay the onus affiliated with large scale investigations, Congress amended the antidumping laws to permit the use of sampling and averaging techniques where circumstances so require. Trade and Tariff Act of 1984, Pub.L. No. 98–573, Title VI, § 620, 98 Stat. 3039, codified at 19 U.S.C. § 1677f–1.[1] In turn, Commerce has enacted regulations to implement these changes. 19 C.F.R. § 353.23[2]

---

**1.** 19 U.S.C. § 1677f–1 provides:

  (a) **In general**
    For the purpose of determining United States price or foreign market value under sections 1677a and 1677b of this title, and for purposes of carrying out annual reviews under section 1675 of this title, the administering authority may—
  (1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, and

    . . . .
  (b) **Selection of samples and averages**

    The authority to select appropriate samples and averages shall rest *exclusively* with the administering authority; but such samples and averages shall be representative of the transactions under investigation. [Emphasis added].

**2.** 19 C.F.R. § 353.23 reads in pertinent part:

  (b) *Averaging or sampling techniques.* The Secretary may use averaging or generally recognized sampling techniques in determining foreign market value in any proceeding in which either a significant volume of sales is involved or a significant number of adjustments to prices is required.

evinces the agency's interpretation of the statutory authority granted it pursuant to 19 U.S.C. § 1677f–1.

■ Plaintiff acknowledges Commerce's authority to use sampling methods pursuant to 19 U.S.C. § 1677f–1. Nevertheless, it maintains, relying on a theory of *expressio unius est exclusio alterius*, that section 1677f–1 prescribes the only allowable methodology for sample selection. Absent application of a generally recognized sampling technique, plaintiff avers, the law requires that *all* sales be examined. In light of the legislative interest in affording the agency greater flexibility and given the use of permissive rather than compulsory language in the wording of the statute, however, the Court is not convinced that Congress intended to limit Commerce's authority to the application of the sampling schemes enunciated therein.

Foremost, the Court takes notice of the abundance of caselaw consistently upholding Commerce's broad discretion in its choice of methodology. *See e.g., Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 700 F.Supp. 538 (1988); *Carlisle Tire & Rubber Co., Div. of Carlisle Corp. v. United States*, 9 CIT 520, 622 F.Supp. 1071 (1985); *Ceramica Regiomontana*, 10 CIT 399, 636 F.Supp. 961; *Southwest Florida Winter Vegetable Growers Ass'n v. United States*, 7 CIT 99, 584 F.Supp. 10 (1984). Furthermore, it is well established that Commerce's failure to apply a discretionary methodology will not amount to error when the agency utilizes an alternative lawful methodology. *Zenith Radio Corp. v. United States*, 9 CIT 110, 113, 606 F.Supp. 695, 699 (1985).

Moreover, this court has recently explored Commerce's authority to resort to sampling and averaging schemes in *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT ——, 704 F.Supp. 1114 (1989), *aff'd*, 901 F.2d 1089 (Fed.Cir 1990), and *Floral Trade Council of Davis, California v. United States*, 12 CIT 1163, 704 F.Supp. 233 (1988). In neither case has the court seen fit to circumscribe Commerce's authority during the sample selection process nor is the Court inclined to do so now.

*Floral Trade Council*, like the case at bar, pertained to simultaneous investigations involving a "significant volume of sales." The court therein acknowledged Congress' purpose in enacting 19 U.S.C. § 1677f–1 and held that any "interpretation of the statute which furthers that goal [*i.e.*, to ease the administrative burden] and is still within the strictures of the statute will be sustained." 12 CIT at 1167, 704 F.Supp. at 237. Thus, the court determined that the criterion to be employed in cases where 19 U.S.C. § 1677f–1 applies, should be whether representative results were achieved. *Id.*

In *Asociacion Colombiana de Flores*, wherein a respondent also alleged that the ITA's sampling technique was defective, the proper use of sampling techniques was again revisited. In keeping with the analysis prescribed in *Floral Trade Council*, the court in *Asociacion Colombiana de Flores*, explained that 19 U.S.C. § 1677f–1 simply requires "that sampling be used only if a significant number of transactions (or adjustments) are involved" and "that the type of sampling employed yield representative results." 13 CIT at ——, 704 F.Supp. at 1121. Moreover, while the court acknowledged that the resulting sample "was not perfectly suited ..., the sampling

Although 19 U.S.C. § 1677f–1 and 19 C.F.R. § 353.23 both refer to the use of sampling and averaging techniques for calculation of "foreign market value" rather than "fair value," it is well established that fair value, while not officially defined, is interpreted as "an estimate of 'foreign market value' during the period of investigation." H.R.Rep. No. 96–317, 96th Cong., 1st Sess. 59. Moreover, Commerce's regulation 19 C.F.R. § 353.1 (1988) defines the relationship between fair value and foreign market value as follows:

Fair value, used during the investigative phase of a proceeding, is intended to be an estimate of foreign market value. Except where specifically noted, all references in this subpart to "foreign market value" should be considered to apply to "fair value" as well; on the other hand, specific references to "fair value" in this subpart should not be considered to refer to "foreign market value."

methodology was legally adequate and the results of the sampling have not been shown to be unrepresentative." 13 CIT at ——, 704 F.Supp. at 1122.

■ Hence, since the parties herein agree that a significant number of transactions were involved in this investigation, the fundamental issue left to determine is whether the results yielded by Option 1 were "representative of the transactions under investigation." In the case at bar, despite Commerce's plan to limit its sales comparisons to thirty-three percent by volume of each respondents' U.S. sales, plaintiff's fair value calculations were based on over seventy percent by volume of plaintiff's total U.S. sales. Seventy percent of an importer's total sales can hardly be deemed to be an insignificant percentage and while plaintiff is correct in noting that the margins would necessarily be most accurate if based on all sales, an estimated margin based on more than two thirds of all U.S. sales is sufficient.

The Court acknowledges that, as plaintiff states, the law imposes a preference for accuracy in LTFV determinations. In an ideal world where the ITA's resources are limitless and the time restrictions for conducting these investigations nonexistent, it might be worthwhile to require examination of all sales data to obtain the most precise results. At present, however, the ITA must proceed under extremely stringent time limitations. In view of these restrictions, the use of modified reporting requirements seems a reasonable procedure to relieve the administrative burden.

■ Next, plaintiff contends that Commerce's decision to adopt Option 1 contravened its rights pursuant to Article VI of the General Agreement on Tariffs and Trade ("GATT"), *opened for signature*, April 12, 1979, 31 U.S.T. 4919, 4929–30, T.I.A.S. No. 9650. On the record developed herein, plaintiff's allegation is wholly without merit.

As correctly noted by plaintiff, paragraphs one and seven of Article VI insure all parties to an antidumping investigation an opportunity to present a full and vigorous defense of their positions. However, significantly missing from plaintiff's discussion of Article VI is any mention of paragraph nine, which expressly provides that the provisions in Article VI "are *not* intended to prevent the authorities of a [country] from proceeding expeditiously with regard to ..., reaching preliminary or final findings." (Emphasis added). Clearly then, to presume, as plaintiff suggests, that the aforementioned sections require Commerce to accept the positions espoused by the parties and the evidence introduced in support thereof, is unreasonable. The Court cannot conceive that in ratifying the GATT Antidumping Code, Congress intended to deprive Commerce of the considerable authority it has possessed to date.

Moreover, the administrative record herein provides numerous instances that suggest the GATT guidelines were observed. Oftentimes, not only were the parties' rights accommodated, but the agency actively solicited their comments throughout the administrative proceedings. It is clear to the Court that the opportunity to be heard, as afforded to respondents in this investigation, plainly satisfies the requirements prescribed by GATT.

Thus, for the reasons stated herein, the Court finds that Commerce's decision to adopt Option 1, which plaintiff originally favored, was in conformity with statutory guidelines and is supported by substantial evidence in the administrative record. Accordingly, Commerce's use of an alternative reporting scheme for comparison of U.S. sales and home market sales is affirmed, and this action is dismissed.