The TORRINGTON COMPANY,
Plaintiff,

v.

UNITED STATES, Defendant,

Nippon Seiko K.K. and NSK Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Toyo Bearing Company, Ltd., Minebea Co., Ltd. and NMB Corporation, Nachi–Fujikoshi Corporation and Nachi America, Inc., Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., THK America, Inc., and Caterpillar, Inc., Defendants–Intervenors.

Court No. 89–06–00357.

United States Court of International Trade.

Feb. 10, 1992.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert DePrest, John M. Breen, Lane S. Hurewitz, Myron A. Brilliant and Patrick J. McDonough, Washington, D.C., for Torrington Co.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeanne E. Davidson, of counsel: John D. McInerney, Sr. Counsel, Douglas S. Cohen, Craig R. Giesse, Diane M. McDevitt, Stephanie J. Mitchell and Maria T. Solomon, Atty. Advisors, Office of the Chief Counsel for Import Admin., Dept. of Commerce, Washington, D.C., for U.S.

Coudert Brothers, Robert A. Lipstein, Lori F. Fischler and James G. Dwyer, Washington, D.C., for Nippon Seiko K.K. and NSK Corp.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger and Kazumune V. Kano, Chicago, Ill., for NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Toyo Bearing Co., Ltd.

Tanaka, Ritger & Middleton, H. William Tanaka, Michele N. Tanaka, Alice L. Mattice and Michael J. Brown, Washington, D.C., for Minebea Co., Ltd. and NMB Corp.

O'Melveny & Myers, Greyson L. Bryan, Kermit W. Almstedt, Erwin P. Eichmann and Geoffrey D. Oliver, Los Angeles, Cal., for Nachi–Fujikoshi Corp. and Nachi America, Inc.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Richard M. Belanger and Neil R. Ellis, Washington, D.C., for Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Sonnenberg, Anderson, O'Donnell & Rodriguez, Steven P. Sonnenberg, of counsel: Michael A. Johnson, Chicago, Ill., for THK America, Inc.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Neil R. Ellis and T. George Davis, Washington, D.C., for Caterpillar, Inc.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Torrington Company ("Torrington"), brings this action to challenge the final determination of the Department of Commerce, International Trade Administration ("Commerce" or "ITA"), in the antidumping investigation of antifriction bearings from Japan. *Final Determinations of Sales at Less Than Fair Value; Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan,* 54 Fed.Reg. 19,101 (1989). Pursuant to Rule 56.1 of the Rules of this Court, plaintiff seeks partial judgment upon the agency record regarding that part of the ITA's determination which stated that the petition encompassed five separate classes or kinds of antifriction bearings. Torring-

ton also contests the ITA's decision to discontinue its investigation of the Japanese costs of production, and the ITA's use of alternative reporting requirements.[1]

## *Discussion*

A final determination by the Department of Commerce will be sustained unless it is not supported by substantial evidence or is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

Under this standard, Commerce is granted considerable deference "in both its interpretation of its statutory mandate and the methods it employs in administering the antidumping law." *Chemical Prods. Corp. v. United States,* 10 CIT 626, 628, 645 F.Supp. 289, 291 (1986) (citations omitted). Where Commerce is faced with two reasonable alternatives, the Court will not impose its own preference, provided the alternative selected by the ITA is supported by substantial evidence in the administrative record and is otherwise in accordance with law. *Torrington I,* 14 CIT at ——, 745 F.Supp. at 723.

## I. Class or Kind

■ Torrington filed an antidumping petition on March 31, 1988. Though the petition described the subject merchandise as all ground antifriction bearings (except tapered roller bearings) and parts thereof, the ITA subdivided the merchandise into five classes or kinds: ball bearings, spherical roller bearings, cylindrical roller bearings, needle roller bearings and spherical plain bearings. 54 Fed.Reg. at 18,999. Plaintiff claims Commerce does not have the authority to modify the petition's de-

---

1. The facts pertinent to this opinion have been recounted in detail in *Torrington Co. v. United States ("Torrington I"),* 14 CIT ——, 745 F.Supp. 718 (1990), *aff'd,* 938 F.2d 1276 (Fed.Cir.1991), *Torrington Co. v. United States ("Torrington II"),*

15 CIT ——, 772 F.Supp. 1284 (1991), and *GMN Georg Muller Nurnberg AG v. United States,* 15 CIT ——, 763 F.Supp. 607 (1991), and they will not be repeated here except as necessary for the resolution of the issues considered herein.

scription of class or kind, but even if it did, its modification is not supported by substantial evidence in the record.

Our appellate court has asserted that, as a matter of law, the ITA has the authority to subdivide the petition's class or kind description when necessary, and when there is substantial evidence to support the subdivision. 938 F.2d at 1277–78. In the case at bar, plaintiff has attempted to prove that antifriction bearings are one class or kind by showing similarities among the various bearings within the framework of the criteria set forth in *Diversified Prods. Corp. v. United States*, 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983).[2] The Court finds that the similarities among the bearings are outweighed by substantial evidence supporting the finding of five classes or kinds. *See Torrington I*, 14 CIT at ——, 745 F.Supp. at 723–27. Accordingly, that determination of the ITA is affirmed.

## II. Cost of Production

■■■■ Torrington also challenges the ITA's decision to terminate the investigation of Japanese firms' costs of production ("COP"). The Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(b) (1988), provides that, if the ITA "has reasonable grounds to believe or suspect that sales in the home market of the country of exportation … have been made at prices which represent less than the cost of producing the merchandise …, such sales shall be disregarded in the determination of foreign market value." A cost of production investigation may be initiated at the request of the petitioner if the petitioner files its request in a timely manner and the information supporting the request meets statutory and judicial standards. 19 U.S.C. § 1677b(b); *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 247–48, 575 F.Supp. 1277, 1280–81 (1983), *aff'd*, 745 F.2d 632 (Fed.Cir.1984); *Floral Trade*

*Council of Davis, Cal. v. United States*, 12 CIT 981, 982, 698 F.Supp. 925, 926 (1988).

In its petition, Torrington alleged that sales in the home markets of Japanese manufacturers of antifriction bearings were being made at prices below the cost of production. General Administrative Record ("GAR") (Pub.) Doc. 1 at 100–02. On the basis of the petition's allegations, the ITA initiated an investigation as to the cost of producing bearings in Japan. Foreign manufacturers objected to the investigation based on the fact that Torrington's allegations relied on country-wide data, rather than the company-specific information required by this court in *Al Tech*. Commerce concurred and in July 1988, Commerce asked Torrington to supplement its submissions. *See* GAR (Pub.) Doc. 120.

When Torrington's supplements still did not satisfy the statutory and *Al Tech* standards, Commerce rescinded the COP investigations in each of the five classes or kinds of bearings as to all the foreign manufacturers since country-wide data did not provide reasonable grounds to believe or suspect that particular respondents were selling particular bearings at prices below cost in their home markets. *See* GAR (Pub.) Doc. 160. Plaintiff contends that the company-specific standard is an overly onerous one which is not consistent with the mandates of the Tariff Act.

In *Torrington II*, this Court followed the *Al Tech* ruling and held that plaintiff was required to "submit specific and objective evidence that particular producers were selling below cost in their home markets." 15 CIT at ——, 772 F.Supp. at 1288. The Court adheres to its opinion in *Torrington II* and finds that Commerce applied the correct standard in rescinding the COP investigations in this case. Furthermore, given the admitted absence of company-specific allegations, the Court finds that the ITA's decision to rescind the cost investigations was in accordance with law.

---

**2.** The criteria include the general physical characteristics of the merchandise, the expectations of the ultimate purchasers, channels of trade in which the goods travel, the ultimate use of the product, and its cost or manner of advertising or display. *Id. See also Kyowa Gas Chem. In-*

*dus. Co. v. United States*, 7 CIT 138, 140, 582 F.Supp. 887, 889 (1984).

These criteria are codified at 19 U.S.C. § 1677j(d)(1) for scope determinations concerning later developed merchandise.

After rescinding the COP investigations, Commerce afforded Torrington the opportunity to submit revised cost allegations which would satisfy the statutory and judicial standards, and which could result in a re-opening of the COP probes. GAR (Pub.) Doc. 164 at 2–3. Petitioner submitted additional data within the ITA's stated deadline, and Commerce then reinstituted the COP investigations pertaining to numerous bearings manufactured by various Japanese producers. *Preliminary Determinations of Sales at Less than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan*, 53 Fed.Reg. 45,343, 45,345 (1988). However, Commerce did not revive the investigations of cylindrical roller bearings manufactured by Nachi or spherical plain bearings made by NTN and Minebea because the amended cost allegations submitted by Torrington failed to set forth company-specific allegations as to those products. *Defendant's Second Memorandum in Opposition to Plaintiffs' Motions for Partial Judgment Upon the Agency Record Regarding Certain Fundamental Issues* at 35–36, n. 16.

Plaintiff does not claim that its revised allegations as to those companies' products complied with the ITA standard. Accordingly, since the Court affirms the ITA's decision to require adherence to that standard, the decision not to reinstitute the cost investigations of the companies for which Torrington provided no company-specific data shall stand.

## III. Alternative Reporting Requirements

■ Torrington also alleges that the ITA abdicated its responsibility to select an appropriate database of the respondents' home market sales when it relied on the respondents' own attestations to the identicality of their bearings for use in comparison with bearings sold in the United States. Additionally, plaintiff contends that respon-

dents differentiated among bearings based on factors which are irrelevant for purposes of these investigations and consequently, certain sales were improperly excluded from the database.

In the course of an antidumping investigation, Commerce compares the United States sales of the merchandise in question to home market sales of "such or similar merchandise." 19 U.S.C. § 1673. Under certain circumstances, the magnitude of transactions subject to investigation may make Commerce's task an inordinately arduous one. Congress envisaged this complication and provided the agency considerable flexibility in the less-than-fair-value comparisons. *See Southwest Florida Winter Vegetable Growers Ass'n v. United States*, 7 CIT 99, 107, 584 F.Supp. 10, 17 (1984). For this purpose, the Trade and Tariff Act of 1984 expressly amended the antidumping law to permit the use of sampling and averaging in such extraordinary circumstances.[3] 19 U.S.C. § 1677f–1 (1988).

Soon after the initiation of the bearings investigations, it became apparent that this was to be one of those extraordinary cases. Due to the enormous volume and complexity of the transactions involved, the ITA invoked the sampling provision and dispensed with its standard sales reporting procedures in order to complete the investigation in a timely manner. Consequently, the ITA proposed two alternative reporting schemes and solicited from interested parties comments on each.

The proposal labeled "Option 1" would require that:

> If the number of U.S. sales having identical home market matches is substantial (at least 33 percent by volume), respondent would be required to report *all* U.S. sales, but *only* those home market sales of products *identical* to those sold in the United States. No similar comparisons

---

**3.** 19 U.S.C. § 1677f–1 provides:

**(a) In general**

For the purpose of determining United States price or foreign market value under sections 1677a and 1677b of this title, ... the administering authority may—

(1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required.

would be required. The Department would still require a full technical description of each bearing sold in the home market (or third country, as appropriate) to verify that the appropriate merchandise has been reported in the sales listing.

If there are not identical matches for at least 33 percent by volume of the products sold in the United States, respondent would list the remaining U.S. products in descending order by volume. From that list, respondent would report similar home market matches, starting with the largest volume U.S. product and continuing down the list sequentially. This process would continue until identical and similar product matches are provided for at least 33 percent coverage of the U.S. products.

GAR (Pub) Doc 105 at 1–2 (emphasis in original). Commerce's "Option 2" would provide that each:

Respondent would be required to provide a detailed list to the Department, within one week of [the ITA's] request, identifying *each* product sold in the United States. From that list, [the ITA] would randomly select bearings for analysis and notify respondent(s) of [their] selection. The respondent would then be required to report all U.S. sales of those selected bearings, plus the home market (or third country) sales of the identical or most similar product.

*Id.* After considering petitioner's and respondents' comments, Commerce elected to adopt Option 1 and respondents were instructed to supply sales data accordingly. GAR (Pub) Doc. 141. Under Option 1, Commerce would compare only home market sales of *identically* matched bearings if these sales could be shown to account for at least thirty-three percent by volume of the respondent's sales in the United States.

Torrington insists that the selection of Option 1 constituted an unauthorized delegation of Commerce's decision-making authority to the respondent firms. Since the importers themselves would signify which of their home market bearings were identical to their U.S. bearings, Torrington rea-

sons the importers wielded the power to determine which sales Commerce would compare. Such an assignment of authority to private parties would be in conflict with this court's holding in *Timken Co. v. United States*, 10 CIT 86, 630 F.Supp. 1327 (1986). *See also Pistachio Group of the Ass'n of Food Indus., Inc. v. United States*, 11 CIT 668, 672, 671 F.Supp. 31, 35 (1987).

In *Timken*, the court reviewed the revocation of an antidumping duty order concerning tapered roller bearings ("TRBs"). In that case, the ITA issued questionnaires to respondents wherein it was requested that respondents provide data only on sales of TRBs which were "identical or 'similar' to those sold for export to the United States. Thus, [respondent] made the initial determination of what constituted identical or similar TRB models" and also "set forth the basis for its selection of similar models." *Timken*, 10 CIT at 94, 630 F.Supp. at 1335. The court found that, in failing *itself* to select which home market TRBs were most similar to U.S. TRBs, the ITA surrendered to respondent "its statutory responsibility for determining what TRB models produced by [respondent] were the *most* similar to models sold in the United States." *Id.* at 98, 630 F.Supp. at 1338 (emphasis in original). The assignment of such an important duty to an interested party constituted an abuse of discretion and the court remanded the case to the ITA for further proceedings.

The distinctions between the situation in *Timken* and the instant case are substantial and material. In the case before the Court, the ITA's Option 1 required respondents to report "*only* those home market sales of products *identical* to those sold in the United States." GAR (Pub.) Doc. 105 at 1 (emphasis in original). The ITA further commanded that the bearings be identical in all respects, leaving little room for machinations by the importers. Moreover, Commerce required that respondents provide "a full technical description of each bearing sold in the home market (or third country, as appropriate) to verify that the appropriate merchandise has been reported in the sales listing." *Id.; see also* GAR

(Pub.) Doc. 143 at 3. In *Timken*, it was the lack of just such verification which most concerned the court. 10 CIT at 98–99, 630 F.Supp. at 1338.

Unlike the respondent in *Timken*, respondents herein did not control the investigation; they merely submitted a preliminary listing to the ITA of the merchandise they considered to be identical. Their selections were subject to verification and the ITA subsequently confirmed whether the home market bearings enumerated by respondents were in fact identical to those sold in the United States. Indeed, where the ITA determined that differences cited by respondents were irrelevant for the purpose of selecting the appropriate home market merchandise for comparison, those differences were disregarded. 54 Fed.Reg. at 19,070–072. *See also* Japanese Administrative Record (Pub.) Doc. 708 at 5. Hence, not only did the ITA retain its authority to select the merchandise to be compared, the record indicates that it exercised that authority with regard to several bearings cited by respondents. Accordingly, the Court finds that the ITA did not delegate improperly its decision-making authority to respondents, and the use of Option 1 as an alternative reporting methodology was entirely reasonable and was otherwise in accordance with law.

### Conclusion

The determination of the ITA as to the subdivision of the petition's description of the class or kind of merchandise to be investigated and as to the rescission of the investigations of the Japanese respondents' costs of production is supported by substantial evidence and is otherwise in accordance with law.

The ITA's use of an alternative reporting methodology in its collection of home market sales data was in conformity with the law and is, accordingly, affirmed.

### JUDGMENT

This case having been duly submitted for decision following plaintiffs' motion pursuant to Rule 56.1 of the Rules of this Court for partial judgment upon the agency record, and the Court, after due deliberation, having rendered a decision herein; now then, in accordance with said decision,

IT IS HEREBY ORDERED that plaintiff's motion for partial judgment upon the agency record is denied; and it is further

ORDERED that the determination of the Department of Commerce, International Trade Administration ("ITA"), as to Counts 1, 2, 7 and 8 of plaintiff's Complaint is affirmed, and those counts are dismissed; and it is further