**TEHNOIMPORTEXPORT, UCF AMERICA INC., and Universal Automotive Co. Ltd., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**The Timkin Company, Defendant–Intervenor.**

No. 91–02–00110.

United States Court of International Trade.

Jan. 23, 1992.

Venable, Baetjer, Howard & Civiletti, John M. Gurley, John C. Dibble and Lindsay B. Meyer, Washington, D.C., for plaintiffs.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Jane E. Meehan, of counsel: Diane M. McDevitt and Mary O'Donnell, Atty.-Advisors, U.S. Dept. of Commerce, Washington, D.C., for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Charles A. St. Charles, Washington, D.C., for defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Tehnoimportexport, UCF America Inc., and Universal Automotive Co. Ltd., move pursuant to Rule 56.1 of the Rules of this Court for partial judgment upon the agency record to contest the determination of the International Trade Administration of the United States Department of Commerce ("ITA" or "Commerce") in *Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From Romania: Final Results of Antidumping Duty Administrative Review* ("Final Results"), 56 Fed.Reg. 1169 (Jan. 11, 1991). In particular, plaintiffs contend that the ITA impermissibly utilized Yugoslavian import steel prices in calculating foreign market value. Plaintiffs also challenge the ITA's calculation of labor costs, surrogate freight costs and currency conversion.

### Background

On February 28, 1990, the ITA published the preliminary results of its administrative review of the antidumping duty order on tapered roller bearings and parts thereof, finished or unfinished from the Republic of Romania. This review covered the sole exports of such merchandise to the United States during the period February 6, 1987, through May 31, 1988. Subsequent to the preliminary results, Commerce extended the comment period and postponed the hearing to enable the Government of Romania to submit corrected per capita gross national product data for the period of review, as the previous government allegedly had provided false economic statistics to the International Monetary Fund ("IMF"). These statistics were the basis for choosing Portugal as the surrogate for purposes of the preliminary results. Subsequently, the IMF published corrected data in the September 1990 issue of *International Financial Statistics*, an IMF publication. Commerce then reopened its inquiry as to the potential surrogate countries that would be appropriate for the purposes of the final determination. Thus, on October 3, 1990, Commerce determined that the following countries were potential surrogates: Yugoslavia, Algeria, Malaysia, South Africa, Brazil and Mexico. On October 15, 1990, Commerce attempted to obtain cost data from each of these potential surrogates. On November 21, 1990, Commerce solicited comments from the parties to the proceeding with respect to such data and the surrogate selection issue. Subsequently, Commerce chose Yugoslavia as the surrogate for purposes of the final determination. Commerce determined, however, that since they would be unable to obtain appropriate sales or constructed value data from any of the selected countries, they would have to use the factors of production approach to calculate foreign market value. The final dumping margin was found to be 13.89%.

### Discussion

Pursuant to the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B) (1988), in reviewing a final ITA determination, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83

L.Ed. 126 (1938). When applying the substantial evidence standard the "court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*'" *American Spring Wire Corp. v. United States,* 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984) (*quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951)).

■ In determining whether to sustain the agency's construction of the antidumping statute or regulations, the Court need not find the agency's interpretation to be the one which the Court views as the most reasonable. *ICC Indus., Inc. v. United States,* 812 F.2d 694, 699 (Fed.Cir.1987); *Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033, 1039 (Fed.Cir.1985). Moreover, "any judicial review of the agency determination is a limited one." *The Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *after remand,* 13 CIT 238, 714 F.Supp. 535 (1989), *aff'd,* 894 F.2d 385 (Fed. Cir.1990). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Id.* Commerce's determination will not be overturned unless the evidence introduced by plaintiffs is "enough to convince the Court that a reasonable mind would not have found ITA's evidence sufficient to support its conclusion." *Tehnoimportexport v. United States,* 15 CIT ——, ——, 766 F.Supp. 1169, 1173 (1991) (*quoting The Torrington Co. v. United States,* 14 CIT ——, ——, 745 F.Supp. 718, 723 (1990), *aff'd,* 938 F.2d 1276 (Fed.Cir.1991)).

■ Since Romania had a state-controlled economy during the period of investigation, however, its sales of tapered roller bearings could not be used to determine foreign market value under 19 U.S.C. § 1677b(c) (1988). Rather, foreign market value was determined by selecting an appropriate non-state controlled economy and determining the prices or the constructed value of tapered roller bearings or similar merchandise in that country. 19 U.S.C. § 1677b(c); 19 C.F.R. § 353.8(a) (1988).[1] Commerce derived the value for Romanian factors of production from data representing costs in Yugoslavia, the selected surrogate.

■ Once Commerce selects a surrogate country, it must determine the basis for calculating the foreign market value. *Timken,* 12 CIT at 957–58, 699 F.Supp. at 302–03. Commerce's regulation establishes a hierarchy of methods for determining the foreign market value of merchandise exported from a non-market economy ("NME") country. 19 C.F.R. § 353.8. The preferred method of calculating foreign market value utilizes the prices at which the merchandise was sold in the surrogate country's home market. If prices were nonexistent or formed an inadequate basis for comparison, Commerce could construct the foreign market value of the imported merchandise using the "factors of production" in the NME country and cost data obtained from a surrogate country. *Timken,* 12 CIT at 957–58, 699 F.Supp. at 302–03; 19 C.F.R. § 353.8.

### I. Commerce's Use of Import Prices Was Reasonable

■ Plaintiffs assert that only the value of Yugoslavian exports could reasonably be used to reflect the value of steel in the Yugoslavian market. They argue that if the non-market economy country under investigation is a manufacturer of the key raw material used, then the surrogate country selected must also be a manufacturer of the key raw material. Thus, they argue that since Romanian bearing manufacturers utilized Romanian steel, the ITA must likewise select a surrogate country that manufacturers its own steel. *Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Judgment on the Agency Record* ("Plaintiffs' Memorandum") at 10. Plaintiffs assert that Yugoslavia, the surrogate country

1. Now found at 19 C.F.R. § 353.52 (1991).

selected, is a manufacturer of bearing quality steel and therefore Commerce should have calculated steel prices based upon steel produced in Yugoslavia, not imported steel. *Id.*

The ITA, however, could not acquire such data at the time they inquired. In fact, Commerce has had difficulty acquiring such data on at least one other occasion. *See Tehnoimportexport,* 15 CIT at ——, 766 F.Supp. at 1176. This data is even more difficult to acquire today. The ITA stated that "the Department first attempted to obtain domestic prices of steel, the major raw material input. Unable to obtain such data, the Department then turned to the question of whether to use official import or export data for Yugoslavian steel inputs." *Final Results,* 56 Fed.Reg. at 1171.

There is no statutory or case law stating that import prices cannot be used to reflect the value of steel in the Yugoslavian market. In fact, Commerce has frequently used import statistics in NME country cases. *See China Nat'l Metals & Minerals Import & Export Corp. v. United States,* 11 CIT 859, 865–66, 674 F.Supp. 1482, 1487–88 (1987); *Porcelain-on-Steel Cooking Ware From the People's Republic of China: Final Determination of Sales at Less Than Fair Value,* 51 Fed. Reg. 36,419 (Oct. 10, 1986); *Petroleum Wax Candles From the PRC: Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 25,085 (July 10, 1986); *Certain Small Diameter Welded Carbon Steel Pipes and Tubes From the PRC: Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 25,078 (July 10, 1986); *Certain Iron Construction Castings From the PRC: Final Determination of Sales at Less Than Fair Value,* 51 Fed.Reg. 9483 (Mar. 19, 1986); *Natural Bristle Paint Brushes and Brush Heads from the PRC: Final Determination of Sales at Less than Fair Value,* 50 Fed. Reg. 52,812 (Dec. 26, 1985).

Commerce stated that they relied on the import prices of steel because of export subsidies in the Yugoslavian steel market and several antidumping proceedings in the European Community ("EC"). Yugoslavia has been the subject of several EC dumping investigations and affirmative determinations have been reached in many steel cases. *See Certain Welded Tubes of Iron or Non-alloy Steel, Originating in Yugoslavia and Romania,* 1990 O.J. (L 91) 8; *Welded Tubes Originating in Yugoslavia and Romania,* 1989 O.J. (L 294) 10; *Imports of Certain Iron or Steel Sections Originating in Yugoslavia or Turkey,* 1988 O.J. (L 190) 5; and *Imports of Certain Sheets and Plates, of Iron or Steel, Originating in Yugoslavia,* 1986 O.J. (L 254) 18. In addition, the United States has also determined that Yugoslavian steel producers benefit from countervailable subsidies. *See, e.g., Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders; Certain Welded Carbon Steel Pipe and Tube Products from Yugoslavia,* 50 Fed.Reg. 53,360 (Dec. 31, 1985). Commerce determined in that investigation that "certain benefits which constitute bounties or grants within the meaning of the countervailing duty law are being provided to producers, manufacturers or exporters in Yugoslavia of certain welded carbon steel pipe and tube products." *Id.*

In another investigation, the ITA issued a final determination stating that tapered roller bearings from Yugoslavia were being sold at less than fair value. *Antidumping Duty Orders; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From Italy and Yugoslavia,* 52 Fed. Reg. 30,417 (Aug. 14, 1987). The estimated weighted antidumping duty margin was 33.61% for Yugoslavia. *Id.*

It has been stated that "Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R.Rep. No. 576, 100th Cong., 2d Sess. 590–91 (1988). In fact, Commerce repeatedly has failed to base foreign market value upon surrogate countries' prices for exports if those exports may benefit from subsidies or are being dumped. *See Porcelain-on-Steel Cooking Ware From the PRC,* 51 Fed.Reg. 36,419; *Shop Towels of Cotton From the PRC: Final Results of Administrative*

*Review of Antidumping Duty Order,* 50 Fed.Reg. 26,020 (June 24, 1985); *Carbon Steel Wire Rod From Poland: Final Determination of Sales at Less Than Fair Value,* 49 Fed.Reg. 29,434 (July 20, 1984). "Evidently, the main consideration is the unreliability of the price information due to the unknown dumping margin if any." *China Nat'l Metals,* 11 CIT at 864, 674 F.Supp. at 1486.

Plaintiffs claim that "the ITA had no 'reason to believe or suspect' that Yugoslavian steel exports to the European Community were being dumped or subsidized." *Plaintiffs' Memorandum* at 25. They claim that Commerce disregarded the Yugoslavian export steel prices based on a "mere possibility" of dumping or subsidies. *Id.* Plaintiffs rely on the standard set forth in *American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir.1986). In that case, the court distinguished between a "reasonable indication" standard and a "mere possibility" standard. *Id.* at 1001–2. "Speculation is not support for a finding. . . ." *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 15, 704 F.Supp. 1114, 1117 (1989), *aff'd,* 901 F.2d 1089 (Fed.Cir.1990). Plaintiffs claim that Commerce decided that there was a "mere possibility" of dumping or subsidies involving Yugoslavian exports, and that the export price should not have been excluded unless there was "reasonable indication" of dumping or subsidies.

Plaintiffs rely heavily on a recent decision before this Court, *China Nat'l Arts And Crafts Import and Export Corp., Tianjin Branch v. United States* ("CNART"), 15 CIT ——, 771 F.Supp. 407 (1991). In *CNART,* Commerce disqualified several proposed surrogate countries claiming that they might benefit from subsidies. *Id.* at 411. The Court, however, determined that Commerce did not base its determination upon substantial evidence. The Court has stated that it:

> is aware that the ITA sometimes takes an 'overly sweeping view of the authority it is granted.' *Olympic Adhesives, Inc. v. United States,* 899 F.2d 1565, 1571, —— Fed.Cir. (T) ——, —— (1990). The substantial evidence standard was

developed to avoid such arbitrary uses of discretion. Guesswork is no substitute for substantial evidence in justifying decisions.

*Id.* 771 F.Supp. at 413.

The evidence in the case at bar, however, is clearly more substantial than that proffered in *CNART.* In that case, the court held that the ITA wrongfully rejected certain surrogate countries because of the possibility of subsidies. Malaysia was wrongfully rejected, for example, based on a prior finding of a *de minimis* export subsidy. *Id.* at 411–12. Furthermore, the court held that Commerce may not exclude countries from surrogacy based on preliminary findings of export subsidies. *Id.* at 412. Commerce's decision in this case, however, was based upon *final* antidumping duty determinations upon comparable merchandise and two *final* countervailing duty determinations in which Commerce determined that countervailable, non-product specific export subsidies were bestowed upon exports of steel products. Their decision was also based on several EC cases. In total, there was substantial evidence to allow a reasonable mind to conclude that there were dumping and subsidies favoring Yugoslavian steel exports.

Moreover, the issue in *CNART* differs from the issue at bar. The issue in *CNART* was whether certain countries may be used as surrogates to calculate foreign market value. In the case at hand, the use of Yugoslavia as the surrogate country is not in dispute. The dispute here is whether Commerce correctly exercised its discretion in choosing import prices rather than export prices. Commerce could have selected either. The fact that there is evidence that Yugoslavian steel exports have been tainted by dumping and subsidies is substantial enough to justify Commerce's decision to use the import prices. When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to choose accordingly. This Court deems Commerce's selection reasonable.

Finally, plaintiffs claim that the price of the import steel is grossly overvalued because it represents no more than a shipload of steel, and therefore, the import price is not a reasonable measure of the fair value of the steel. *Plaintiffs' Memorandum* at 24–5. Furthermore, plaintiffs contend that the larger the quantity of steel sold, the lower the price, and thus, since Yugoslavia exports nearly four times the steel it imports, the price is overvalued. *Id.* Plaintiffs also provide the Court with the statistics reflecting steel prices imported into the EC from other countries in the world. The statistics provided by the plaintiffs, however, are ambiguous as they provide basket categories and do not specify the quantities of steel imported or exported from which countries.[2] Nevertheless, the import prices selected by Commerce represent the price of steel available to domestic producers of tapered roller bearings. Therefore, Commerce acted reasonably in selecting the import prices of steel as a method of valuation.

II. Case Should be Remanded to the ITA to Determine Surrogate Labor Rates and Freight Costs

Commerce concedes that it improperly calculated the surrogate labor rates based upon a 42 hour work week, rather than a 40 hour work week and based upon 4.333 weeks per month, instead of four weeks per month. Defendant-intervenor, Timken Co., claims that "the cost to an employer, however, for each hour that an employee actually works includes costs for vacations, sick days, holidays and other days which the employee does not work but for which the employee is nonetheless compensated." *Memorandum of The Timken Company in Response to Plaintiffs' Second Motion for Partial Judgment on the Agency Record* at 2. If this were the case then employers must also account for the number of breaks an employee takes in one day, the number of times they make personal phone calls, the duration of their lunch, health benefits, etc. Factoring these variables into the hourly rate would distort the pay scale. Earning "X dollars per hour" is a consistent term of measurement and traditionally fringe benefits such as vacation and sick days are not included in the hourly rate. The parties have agreed to a remand on this issue and thus, this issue is remanded to the ITA for recalculation consistent with this opinion.

Commerce also concedes that the adjustment made to the U.S. price for inland freight costs is erroneous because Commerce improperly used an annual average exchange rate to convert the December freight costs into dollars. This issue is likewise remanded to Commerce for recalculation.

CONCLUSION

The Court holds that the ITA's use of the Yugoslavian import price of steel was supported by substantial evidence and was otherwise in accordance with law. Furthermore, Commerce concedes that it improperly calculated the labor rates and freight costs.

Accordingly, this case is affirmed in part regarding Commerce's selection of import steel prices, and remanded in part to the ITA for recalculation of the labor rates and freight costs, and the ITA shall make any other adjustments in its determinations as these changes may require. Commerce shall report the results of the remand determination to this Court within sixty (60) days of the date this opinion is entered.

---

**2.** Plaintiffs provided the Court with the following statistics for alloy steel bar:

| Source | Quantity | Price |
|---|---|---|
| Yugoslavia–EC | 5,954 Metric tons (MT) | .5329 ecus/kg. |
| EC–Yugoslavia | 1,654 MT | .9135 ecus/kg. |
| World–EC | 525,006 MT | .637 ecus/kg. |
| EC–World | 610,731 MT | .527 ecus/kg. |

Plaintiffs' Memorandum at 22–5.