**UNION CAMP CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Dastech International, Inc., et al.,**
**Defendant–Intervenors.**

**Slip Op. 96–123.**
**Court No. 94–08–00480.**

United States Court of
International Trade.

Aug. 5, 1996.

Fenwick & West, Roger M. Golden and Phyllis E. Andes, Washington, DC, for Plaintiff.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Cynthia B. Schultz, U.S. Department of Justice, Civil

Division, Commercial Litigation Branch; Stacy J. Ettinger, Office of the Chief Counsel for Import Administration, for Defendant.

Williams, Mullen, Christian & Dobbins, P.C., William E. Perry, Washington, DC, for Defendants–Intervenors.

## MEMORANDUM AND ORDER

WALLACH, Judge:

### I

### INTRODUCTION

Plaintiff Union Camp Corporation ("Union Camp") and Defendant–Intervenors [1] Dastech International, Incorporated, Guangdong Chemicals I/E Corporation (Group), ICC Chemical Corporation, Sinochem International Chemical Company, Limited, Sinochem Jiangsu I/E Corporation, and Tianjin Chemicals I/E Corporation ("Defendant–Intervenors" or collectively "Dastech") challenge as unsupported by substantial evidence and not in accordance with law certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final less-than-fair-value ("LTFV") determination in the antidumping investigation of *Sebacic Acid from the People's Republic of China*, published at 59 Fed.Reg. 28,053 (May 31, 1994) (*"Final Determination"*). Specifically, Union Camp contests Commerce's decision to use the Indian value of refined octanol–1 as the surrogate value of crude octanol–2, a subsidiary product of the sebacic acid production process. This decision, according to Union Camp, resulted in the allocation of costs for octanol–2 as a co-product of sebacic acid instead of the subtraction of costs as a by-product. Defendant–Intervenors contest Commerce's calculation of 1) a surrogate value for packing materials, and 2) a surrogate value for truck freight costs.

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (1988) and 28 U.S.C. § 1581(c) (1988).

For the reasons discussed below, the Court holds that Commerce's use of the Indian value of refined octanol–1 for octanol–2 was unsupported by substantial evidence in the record and not in accordance with law. Further, the Court affirms Commerce's calculation of the surrogate value for packing materials as supported by substantial evidence on the record and in accordance with law. In addition, the Court affirms Commerce's selection of a surrogate value for truck freight costs.

### II

### BACKGROUND

On July 19, 1993, Union Camp filed a petition with Commerce and the United States International Trade Commission ("ITC") alleging that sebacic acid [2] from the People's Republic of China ("PRC") was being sold at prices below fair market value to the detriment of the domestic industry. On December 27, 1993, Commerce found preliminary dumping margins for four Chinese respondents ranging from 20.01 to 40.25. *Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Sebacic Acid From the People's Republic of China*, 59 Fed.Reg. 565 (Jan. 5, 1994) (*"Preliminary Determination"*). Subsequent to verification conducted by Commerce officials, Commerce determined final dumping margins for the same four respondents ranging from 43.72 to 85.45. *Final Determination*, 59 Fed.Reg. at 28,053.

Upon notification of the ITC's final affirmative injury determination on July 5, 1994, Commerce published the antidumping duty order on July 14, 1994. *Antidumping Duty Order: Sebacic Acid From the People's Republic of China (PRC)*, 59 Fed.Reg. 35,909.

---

1. This case was consolidated. As a result, Defendant–Intervenors are also Plaintiffs on certain issues. The portion challenging the ITC's threat determination was severed into Court Number 94–08–00467S.

2. Sebacic acid is a white powder used in the manufacture of nylon 6/10 (a polymer used for

toothbrush and paintbrush bristles and paper machine felts), plasticizers, automotive coolants, esters, polyamides, polyester castings and films, inks and adhesives, lubricants, and polyurethane castings and coatings. *See Preliminary Determination*, 59 Fed.Reg. at 566.

Union Camp filed this action, contesting Commerce's use of the Indian value of octanol–1 for octanol–2, a subsidiary product produced as a result of the sebacic acid production process. Union Camp seeks remand to the ITA with instructions that Commerce value octanol–2 based on an appropriate cost of crude octanol–2 rather than on the Indian selling price for refined octanol–1, and then recalculate the by-product/co-product determination with the correct value.

Dastech is contesting Commerce's calculation of 1) a surrogate value for packing materials, and 2) a surrogate value for truck freight costs. Dastech seeks remand to the ITA with instructions to calculate the packing costs using an Indian domestic price for the surrogate value of packing material, to recalculate the weight of such materials, and to pro-rate the truck transportation costs based on surrogate values.

## III

## DISCUSSION

### A

**The Standard Of Review For ITA Determinations Requires Affirmation Unless A Determination Is Unsupported By Substantial Record Evidence Or Otherwise Not In Accordance With Law**

■ The Court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). "This restricted standard of review is reflective of the legislative intent that courts afford considerable deference to Commerce's expertise in administering the antidumping law.... [T]he deference granted to the agency's interpretation of the statutes it administers extends to the methodology it applies to fulfill its statutory mandate." *GMN Georg Muller Nurnberg*

*AG v. United States,* 15 CIT 174, 178, 763 F.Supp. 607, 611 (1991) (citations omitted).

■ "The proper role of this court, then, is 'to determine whether the methodology used by the ITA is in accordance with law,' and as 'long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.' " *Id.* (citing *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 404–05, 636 F.Supp. 961, 965–66 (citations omitted)).

### B

**The ITA Must Use "Best Information Available" In This Case Because The PRC Is A Nonmarket Economy Country**

When dealing with a nonmarket economy ("NME") country, such as the PRC, the statute provides that under certain conditions, Commerce chooses a "surrogate" country pursuant to 19 U.S.C. § 1677b(c) (1988). This provision requires Commerce to calculate foreign market value for NME products based on the "best information available" ("BIA") regarding the values of the "factors of production" in an appropriate market economy. 19 U.S.C. § 1677b(c)(1). In valuing NME factors of production, Commerce uses prices or costs of factors of production in a market economy country which is "at a level of economic development comparable" to that of the NME and which has "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4).

Comparable merchandise is broader than the description of "same or similar" merchandise which is usually used in antidumping investigations. S.Rep. No. 71, 100th Cong., 1st Sess., at 106 (1987) ("Because the Commerce Department may have difficulties in getting detailed data from countries not subject to investigation, the bill gives the Commerce Department the authority to use 'comparable merchandise' as the basis for foreign market value.").

Here, Commerce chose India as the surrogate country. Commerce used the Indian value of octanol–1 as the value for octanol–2, determining that octanol–1 was comparable merchandise to octanol–2. It is this decision by Commerce which is contested by Union Camp.

## C

### Commerce's Decision To Use The Indian Value Of Refined Octanol–1 As The Value Of Crude Octanol–2 Was Unsupported By Substantial Evidence On The Record And Not In Accordance With Law

The Court finds that Commerce's determination to use the Indian value of octanol–1 to value octanol–2 was unsupported by substantial evidence on the record and not otherwise in accordance with law. Consequently, for the reasons discussed below, this portion of the *Final Determination* is remanded to Commerce.

### 1

### Octanol–2 Is A By–Product Of The Sebacic Acid Production Process

As stated above, Commerce calculates foreign market value on the basis of the "value of the factors of production" in a surrogate market economy country when conducting NME investigations. *See* 19 U.S.C. § 1677b(c)(1). Once the surrogate values of the factors of production are determined, Commerce calculates the foreign market value by multiplying the verified factors of production by the appropriate surrogate values for the different inputs. *Final Determination,* 59 Fed.Reg. at 28,055.

Subsidiary chemical products are produced as "an unavoidable consequence" to the production of sebacic acid. *Preliminary Deter-*

mination, 59 Fed.Reg. at 569. In order to account for subsidiary products, Commerce calculated the total value of each subsidiary product produced in the production process as a percentage of the total value of sebacic acid and all subsidiary products yielded in the process. If the relative value of the subsidiary product was insignificant, Commerce considered it a "by-product" and subtracted its sales revenues from sebacic acid production costs. For a subsidiary product that had a significant relative value, Commerce considered it to be a "co-product" and its costs (material, labor, energy and factory overhead) were allocated among sebacic acid and the subsidiary products. *Final Determination,* 59 Fed.Reg. at 28,056.

Crude capryl alcohol is among the subsidiary products to the sebacic acid production process.[3] The chemical term for capryl alcohol is 2–octanol, referred to as octanol–2 by the parties. Commerce used the Indian value of octanol–1 to value octanol–2, resulting in the determination that octanol–2 was a co-product of sebacic acid. As a result, Commerce allocated the costs among sebacic acid and the subsidiary products. Union Camp claims that had Commerce valued octanol–2 correctly, it would be considered a by-product, and its sales revenues would have been subtracted.[4] As discussed below, the Court agrees with Union Camp that Commerce's use of the Indian value of octanol–1 to value octanol–2 is unsupported by substantial evidence on the record and is not in accordance with law.

### 2

### Octanol–1 Is Not A Comparable Product To Octanol–2

■ Commerce was unable to locate a value for octanol–2 in India. *Final Determination,* 59 Fed.Reg. at 28,058. Union Camp agrees that there is no Indian value for

**3.** In addition to capryl alcohol, Commerce identified glycerine and fatty acid as subsidiary products.

**4.** Union Camp also argued that "[t]he 'best information available' might indicate that zero is the correct value and that respondents, therefore, are entitled to no credit for octanol–2." Brief In Support of Union Camp Corporation's Rule 56.2 Motion For Judgment Upon the Agency Record at 10 ("Union Camp's Brief"). Commerce rebutted this suggestion by stating that NME cases

would become unworkable "[i]f Commerce used a zero value every time it was unable to locate an identical surrogate match ...". Defendant's Memorandum In Opposition to Union Camp Corporation's and Dastech International's Motions For Judgment Upon the Agency Record at 20 ("United States' Mem."). Be that as it may, the Court will hold Commerce to the standard of supporting its actions with substantial evidence on the record and acting in accordance with law.

octanol–2.[5] In a situation such as this, the statute provides for Commerce to determine foreign market value using merchandise comparable to the merchandise under investigation from a "surrogate" market economy country. *See* 19 U.S.C. § 1677b(c)(4). Although Congress deliberately used the words "comparable merchandise" to provide a broader spectrum of choices for Commerce than the phrase "such or similar merchandise", S.Rep. No. 71, 100th Cong., 1st Sess., at 106 (1987), *supra,* Commerce's use of the Indian value of octanol–1 for octanol–2 is unsupported by substantial evidence on the record and not in accordance with law because octanol–1 is not a comparable product to octanol–2.

In defense of its use of octanol–1 to value octanol–2, Commerce stated that:

> We find that octanol–1 and capryl alcohol (i.e., octanol–2) share very similar molecular formulae though they are not identical products. We were able to obtain an Indian price for octanol–1. We were unsuccessful in locating a price for octanol–2 ... Therefore ... we have relied on the price of octanol–1 ... the closest product we could obtain to value capryl alcohol.

*Final Determination,* 59 Fed.Reg. at 28,058. Further, Commerce points out that this Court has stated that:

> [W]hen valuing factors of production in a nonmarket economy investigation, Commerce has no affirmative mandate to finish plaintiffs' homework by locating *additional,* but perhaps more favorable, surrogate information.... [19 U.S.C. §§] 1677b(c)(2) (1988) and 1677b(c)(4) (1988) in conjunction provide only that Commerce "shall determine" to the extent possible foreign market value from the value of factors of production in a surrogate country. Respondent, rather than Commerce, has the burden of creating an adequate record.

*Tianjin Mach. Import & Export Corp. v. United States,* 16 CIT 931, 941–42, 806 F.Supp. 1008, 1019 (1992) (citation omitted) (emphasis in original).

Commerce's decision, however, is unsupported by substantial evidence on the record. Octanol–1 (or octanol) is derived from a process entirely unrelated to the sebacic acid production process. *See* Rebuttal Brief of Petitioner Union Camp Corp., Apr. 13, 1994, p. 12, Administrative Record ("AR"), Fiche 31, Frame ("Fr.") 20. Union Camp informed Commerce that Octanol–1 is a high-priced petrochemical. Letter from Fenwick & West to DOC, Nov. 23, 1993, p. 3, AR, Fiche 25, Fr. 89, 91. Union Camp pointed out to Commerce that "the synonym for 'caproyl alcohol'[6] is '2–octanol,' *not* 'octanol.' Octanol and 2–octanol are two *very different* products." Letter from Fenwick & West to DOC, Feb. 14, 1994, p. 9, AR, Fiche 25, Fr. 81 (emphasis in original). Despite sharing the same molecular formula, which means they are isomers, octanol–1 and octanol–2 have different molecular structures which result in different physical properties such as boiling point, freezing point and density. Letter from Fenwick & West, Apr. 8, 1994, p. 15, Annex 3, AR, Fiche 30, Fr. 21, 36. In octanol–1, the oxygen atom is bonded to the carbon-chain end. By contrast, the oxygen atom in octanol–2 is bonded to a carbon atom adjacent to the chain end. *Id.* Octanol–1 and octanol–2 are not interchangeable because of these differences. *Id.*

Commerce's regulations provide that United States' costs and prices may be used when there is no non-state-controlled-economy country, other than the U.S., at a stage of economic development comparable to that of the home market country and there is no non-state-controlled-economy country, other than the U.S., that is not at a stage of economic development comparable to that of the home market country. 19 C.F.R. § 353.52(b).

Commerce acknowledged that the United States and Japan were also producers of sebacic acid, but declined to obtain a price for octanol–2 from a Japanese or U.S. publication because "Japan and the United States are not on the list of recommended surrogate

---

**5.** It is unclear from the record whether sebacic acid was produced in India during the period of investigation.

**6.** Union Camp used the term "caproyl" alcohol instead of "capryl" alcohol throughout this document. That was clearly a typographical error and intended to refer to capryl alcohol.

countries for the PRC." Union Camp's Brief at 6, 12 (citing Concurrence Mem., May 3, 1994, at 14, AR, Fiche 67, Fr. 14). However, the statute provides that factor prices or costs in a comparable market economy country are to be used "to the extent possible". 19 U.S.C. § 1677b(c)(4). In addition, Commerce's regulations provide that United States' prices or costs may be used to establish surrogate values. 19 C.F.R. § 353.52(b)(3). If non-comparable market economy countries are used, Commerce is instructed to "adjust the foreign market value for known differences in the costs of material and fabrication." 19 C.F.R. § 353.52(b)(2).

■ Because octanol–1 is not a comparable product to octanol–2, Commerce should have used information from the United States or Japan, where sebacic acid is produced and octanol–2 is sold, as BIA. Commerce's argument that Union Camp did not supply it with the U.S. value of octanol–2 is rejected. The record reflects that Union Camp provided Commerce with U.S. values for octanol–2 in Union Camp's supplemental petition dated August 2, 1993. AR, Fiche 3, Fr. 12, 13. In the circumstances here discussed, Commerce could properly have used that information to provide an accurate surrogate value for what, from the record, appears to be an entirely different product than octanol–1. Accordingly, the Court concludes that Commerce's use of the Indian value of refined octanol–1 is not supported by substantial evidence on the record and is not in accordance with law, and remands to Commerce with instructions that Commerce value octanol–2 based on an appropriate cost of crude octanol–2, which may be the U.S. cost, rather than on the Indian selling price for refined octanol–1, and then recalculate the by-product/co-product determination with the correct value.

## D

### Commerce's Calculation Of A Surrogate Value For Packing Materials Is Reasonable, Supported By Substantial Evidence, And Otherwise In Accordance With Law

■ Commerce's calculation of the weight of the packing materials and its use of public-ly available published information ("PAPI") to value the packing materials is supported by substantial evidence on the record and otherwise in accordance with law. Consequently, the Court sustains Commerce's determination with regard to the surrogate value for packing materials.

## 1

### The Record Reflects Substantial Support For Commerce's Calculation Of The Weight Of The Packing Materials

Dastech argues that Commerce's decision concerning the weight of the packing material is unsupported by substantial evidence on the record and not in accordance with law for three reasons. First, Dastech argues that the Chinese exporters reported the weight of all three bags together and that, as a result, Commerce erred in tripling the weight of the plastic bags. Second, Dastech submits that Commerce should have weighed the bags during verification. And third, Dastech argues that Commerce should have used information from the sales invoices and related documents which disclosed the weight of the packing materials (ranging between 0.2 kg and 0.3 kg). For the reasons that follow, Dastech's arguments fail.

As part of the LTFV investigation, Commerce requested information concerning the weight of the packing materials used to pack sebacic acid. In its questionnaire, Commerce asked the respondents to "describe and report the quantity of *all materials* used to pack the subject merchandise . . . *on a per unit basis*." AD Questionnaire, Sect. D at 4–5, AR, Fiche 7, Fr. 32, 33 (emphasis added). All of the Chinese exporters reported that "[f]orty 25 kg plastic bags . . . are used to pack one metric ton of sebacic acid for delivery to the port. No other packing materials are used. . . ." SICC/Weifang Section D Response, AR, Fiche 10, Fr. 25; Jiangsu/Nangong Section D Response, AR, Fiche 11, Fr. 24, 25; Tianjin/Handan Section D Response, AR, Fiche 12, Fr. 24; Guangdong/Tongliao Section D Response, AR, Fiche 13, Fr. 24. Commerce sent a deficiency questionnaire to

the Chinese exporters, and asked "How many kilograms does an empty 25 kg polyethylene bag weigh?" Deficiency Questionnaire Attach., AR, Fiche 16, Fr. 78. The respondents replied that an empty 25 kg polyethylene bag weighed 0.75 kg. Letter from Miller Canfield to Commerce in Reply to Nov. 19, 1993 Deficiency Letter, Dec. 3, 1993, AR, Fiche 51, Fr. 64, 67.

During verification, Commerce discovered that two polyethylene liners were used inside one woven plastic bag to pack 25 kg of sebacic acid. The investigators determined that the Chinese factories had only supplied the weight of the woven plastic bag without the liners. They found that there were three components to the packing material. In order to account for this additional packing material, Commerce used as BIA the reported weight of one plastic bag to determine the total weight of the three bags for 25 kg of sebacic acid, *i.e.*, $3 \times 0.75 \text{ kg} = 2.25 \text{ kg}$. Dep't's Mem. Regarding Alleged Ministerial Errors, June 22, 1995, at 2, AR, Fiche 71, Fr. 47, 48. The investigators did not weigh, either individually or together, the woven plastic bag and its liners.

■■■ When Commerce "does not receive a *complete, accurate, and timely* response to the Secretary's request for factual information", it may use BIA. *See* 19 C.F.R. § 353.37(a)(1) (emphasis added). "The best information available is not necessarily the most accurate information; rather, it is information that has become usable due to a respondent's failure to provide accurate information." *Usinor Sacilor v. United States*, 18 CIT 1155, 872 F.Supp. 1000, 1006 (1994); *Asociacion Colombiana de Exportadores de Flores v. United States*, 13 CIT 13, 16, 704 F.Supp. 1114, 1117 (1989), *aff'd*, 901 F.2d 1089 (1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990). By not specifying the amount, weight, and type of packing materials used, respondents failed to completely and accurately respond to Commerce's request for information found in the

questionnaire. Therefore, Commerce was justified in using the weight of the woven plastic bag as BIA for the weight of the polyethylene liners.

■■ Dastech argues that during verification, Commerce should have verified the weight of the plastic bags and liners. Commerce, however, does not have an obligation to verify every piece of information supplied to it. *See Sugiyama Chain Co. v. United States*, 16 CIT 526, 532, 797 F.Supp. 989, 995 (1992). Indeed, "[a] requirement that Commerce must search out new information in the guise of 'verification,' ... is really a mandate that Commerce must shoulder any burden that the [respondents] choose not to meet." *Tianjin Mach. Import & Export Corp.*, 16 CIT at 936, 806 F.Supp. at 1015. Further, Commerce alleges, United States' Mem. at ftnt 11, and Defendant–Intervenors do not contravene, that "[t]here is no evidence in the verification reports or elsewhere on the record that the Chinese respondents either suggested or requested that Commerce weigh the plastic liner bags discovered during verification." *Id.*

Dastech also argues that the record contained accurate information reflecting that the total weight of the packing material in the amount of 0.2 to 0.3 kg[7] found in invoices and shipping documents. However, this information was not provided to Commerce in response to its specific requests for information on packing materials and their weight. Commerce reasonably relied on the responses from the respondents to its direct inquiries. Commerce does not have the resources to sort through all of the information given to it by respondents in order to deduce information that has been specifically requested and responded to by respondents. *See Sugiyama Chain Co.*, 16 CIT at 532, 797 F.Supp. at 994 ("[I]f the burden of compiling, checking, rechecking, and finding mistakes in the submission of [respondents] were placed upon Commerce, it would transform the adminis-

---

7. At oral argument, counsel for Dastech explained the discrepancy between the weight of the packing material as disclosed in the sales invoices and related documents (ranging between 0.2 kg and 0.3 kg) and the weight of the packing material as answered by the Chinese respondents in the deficiency questionnaire (0.75 kg), as probably due to an error by counsel for Dastech in reading the facsimile sent to him by the Chinese respondents responding to the deficiency questionnaire.

trative process into a futility."). Therefore, Dastech's argument that Commerce should have calculated the weight of the packing materials based on information found in the invoices and shipping documents fails.[8]

## 2

### Commerce's Use Of Indian Import Statistics As PAPI Is Sustained

In NME investigations, Commerce "shall utilize, to the extent possible, the prices or costs of factors in one or more market economy countries ...", 19 U.S.C. § 1677b(c), in valuing factors of production. "[T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1)(B). This standard is different from BIA discussed above.

Generally, Commerce will select, where possible, publicly available published value which is: (1) an average non-export value; (2) representative of a range of prices within the POI; (3) product-specific; and (4) tax-exclusive. See Preliminary Determination, 59 Fed.Reg. at 568. Commerce considered three sources from which to determine the value of the packing material: (1) the Monthly Statistics of the Foreign Trade (Indian Government) for the period of April 1992 through December 1992 ("Source 1"); (2) Monthly Statistics of the Foreign Trade of India (Indian Government) for the period April 1991 through December 1991 ("Source 2"); and (3) a January 30, 1992 U.S. Cable from the American Embassy in New Delhi with data for the period May 1991 through December 1991 ("Source 3"). Concurrence Mem., May 20, 1994, AR, Fiche 71, Fr. 38, 39.

Commerce chose Source 1 to value the woven plastic bags because this source was "product-specific" and supplied the "more re-

cent value". Id. Source 1 was also used to value the polyethylene liners because it was determined that Source 1 was the only source for this information. Id.

Dastech argues that Commerce erred when it did not choose Source 3, the Indian domestic price for polyethylene bags. Defendant–Intervenors' Dastech International, Inc. et al. Reply Brief at 5 ("Dastech's Reply"). Dastech submits that the statutory mandate to use the best available information as to surrogate values "in" the market economy country requires Commerce to use the actual Indian domestic price. Id. at 6; see 19 U.S.C. § 1677b(c)(1)(B). In addition, Dastech points to the broad categories of bags contained in Source 1, sacks and bags including cones, versus the specific domestic price for plastic bags reflected in Source 3. Dastech's Reply at 9.

■ "When Commerce is faced with the decision to choose between two reasonable alternatives and one alternative is favored over the other in their eyes, then they have the discretion to chose accordingly." Tehnoimportexport v. United States, 16 CIT 13, 18, 783 F.Supp. 1401, 1406 (1992). The Court finds that any of the three sources considered by Commerce were reasonable. Further, Source 1 contains values "in" India because the statistics indicate the quantity of bags imported into India and their value in Indian rupees. Therefore, Commerce's choice to use Source 1 to value the packing material is within their discretion and is sustained.

## a

### Commerce Made An Insignificant Error In Its Calculation Of The Value Of The Woven Plastic Bags

To determine the value of the woven plastic bags, Commerce averaged the total value and the total quantity of all country imports

---

8. Dastech also argues that Commerce should have looked to the weight of the packing material for one metric ton of sebacic acid, for which Commerce used 3.0 kgs, as evidence that the weight of the packing material for twenty-five kilograms of sebacic acid must be significantly less than that amount. However, the record

reflects that Commerce did not calculate the weight for plastic liner(s) used in packing one metric ton of sebacic acid resulting in the cost of one metric ton packing material being "greatly understated." Ministerial Errors Mem., at 1–2, AR, Fiche 71, Fr. 48, 49.

from Source 1. United States' Mem. at 25. Dastech claims that Commerce erred in this calculation because the numbers listed by Commerce did not add up to the total quantity and total value listed. Defendant–Intervenors' Guangdong Chemicals I/E Corp., et al. Brief In Support of Their Motion For Judgment Upon the Agency Record at 16 ("Dastech's Brief"). However, this discrepancy was explained by Defendant as a clerical error in which Commerce inadvertently included imports from the PRC without listing the PRC as an importer and omitted listing imports from the Netherlands although these imports were included in the total. Although the PRC's imports should not have been included in the total because of the PRC's status as a NME, this clerical error was insignificant.[9]

Dastech also argues that "if $5.41/kg is the surrogate value of polyethylene bags, as Commerce alleges, then Commerce applied it against the wrong packing material entry in its Calculation Memorandum...." Dastech's Reply at 14. Dastech is incorrect. The following from the Calculation Memorandum for Weifang Factory displays the information in controversy:

| (k) PACKING | (USAGE) | (TOTWGT) | (RS/UNIT) | ($/UNIT) |
|---|---|---|---|---|
| ... | | | | |
| 25kg bags 0.75kg/bag | 66.399 | 49.80 | 173.970 | 5.66 |
| ... | | | | |
| 25kg bags 0.75kg/bag | 33.199 | 24.90 | 166.160 | 5.41 |

The second line encompasses the woven plastic bags and the first is the liners. As discussed previously, Commerce used the information on the weight and amount of the woven plastic bags as BIA for the liners. This may be determined by noting that the figures for the first line are double those of the second line (although 33.199 multiplied by 2 is actually 66.398, this is an harmless error). Source 1, used to determine the price per unit of the woven plastic bags resulted in $5.41 per unit, as reflected in the second line of the Calculation Memorandum. Dastech apparently believes that the $5.41 price should have applied to the liners. However, as discussed more fully below, Commerce calculated the surrogate value of the liners using information concerning "other plastic bags" which resulted in 173.97Rs/unit (average value of 170.43 multiplied by the inflator 1.0208, equaling 173.97). Converting 173.97Rs/unit to $/unit by multiplying 173.97 by the U.S. exchange rate of 0.032535 results in $5.66 per unit. Therefore, Commerce did not err in applying the surrogate value against the packing material.

#### b

### There Was No Significant Error In The Calculation Of The Value Of "Other Plastic Bags"

The calculation to determine the value of "other plastic bags" (i.e., liners), also contained a harmless clerical error. Dastech states simply that "[e]rrors in addition were also made by the [ITA] in computing the average value of 'Other Plastic Bags' based on the Indian import statistics." Dastech's Brief at 16. The error appears to be insignificant.

Mexico was not included on the reproduced list of country-specific imports although the import total included these imports. The

---

9. In order to calculate the value of the woven plastic bags, Commerce multiplied the average per unit value (obtained by dividing the total value by the total quantity) by the inflator (1.0208, derived from the monthly wholesale price indices of India as published in the *International Financial Statistics*, Concurrence Mem., May 20, 1994, at 34, AR, Fiche 71, Fr. 34) in order to determine the value of the polyethylene bag during the POI. The incorrect average value calculated in the Concurrence Memoranda was RS 170.33. The corrected average is RS 166.16, a difference of RS 4.17, which is *de minimis*. Further, Commerce points out that although this error occurred in the Concurrence Memoranda, the correct figure was used in the final margin calculation. Thus, in the final margin calculation, Commerce multiplied the inflated Rs/unit value (166.16) by the U.S. exchange rate (0.032535) which resulted in $5.41/unit, a figure identical to the one Commerce used in its final margin calculation to value polyethylene bags. *See* Margin Calculation Mem. and Source Documents, AR, Fiche 68, Fr. 9.

imports from Mexico were correctly included in the total and in the calculation of the value of the "other plastic bags". Thus, the error in not listing Mexico was insignificant and did not effect the final value of the packing materials. *See* Margin Calculation Mem. and Source Documents, AR., Fiche 69, Fr. 21, 22.

In addition, Commerce determined the value of the packing material on the basis of an average of import values from Indian government statistical import information instead of on the domestic value of the polyethylene bags. Although Commerce's calculations contained some sloppy workmanship, the resulting errors were insignificant and do not justify remand for correction.

### E

### Commerce's Valuation Of Truck Transportation Distances Is Supported By Substantial Evidence On The Record And Is In Accordance With Law

In determining the surrogate value for truck freight rates, Commerce used as BIA values from India, the surrogate country. Commerce used a flat rate of rupees ("RS") per metric ton ("mt") for transportation distances between certain ranges of kilometers,[10] set out below, which were obtained from a 1993 U.S. Embassy Cable. Final Determination Concurrence Mem., May 20, 1994, AR, Fiche 36, Fr. 70.

(a) 25–100 km: RS250/mt
(b) up to 250 km: RS500/mt
(c) up to 500 km: RS750/mt
(d) up to 1,000 km: RS1,100/mt
(e) up to 1,500 km: RS1,900/mt

Dastech contests Commerce's calculation of truck freight rates for distances of less than 25 kilometers. Specifically, the record reflects that Commerce used the 25–100 kilometer rate for distances of less than 25

kilometers. In essence, then, Commerce used the same rate of RS250/mt for distances of 1 kilometer as it would for a distance of 100 kilometers. Dastech argues that Commerce should have pro-rated distances of less than 25 kilometers.

To support its argument for pro-rating, Dastech points to Commerce's calculation of train freight rates, which contain almost identical increments as the truck freight rates.[11] Commerce stated that with regard to train freight rates, "we ... adjusted this rate to account for distances which were greater than 1,000 kilometers by multiplying the freight rate by the ratio of the actual distance to 1,000 kilometers." Dastech's Reply at 29–30.

■ Commerce acted in accordance with law when it decided not to pro-rate distances less than 25 kilometers. The Court will overturn a determination by Commerce when evidence is introduced which convinces the Court that a reasonable mind would not have found Commerce's evidence sufficient to support its conclusion. *Tehnoimportexport,* 16 CIT at 14, 783 F.Supp. at 1403. Here, it is reasonable to pro-rate distances longer than the largest increment for which Commerce had information because a failure to pro-rate longer distances would effectively cap the rate for longer distances. In other words, a rate of RS295.80/mt, in the case of train freight rates, would be charged for distances of 1000 kilometers as well as 2000 kilometers.

■ Commerce's decision not to pro-rate for distances shorter than the smallest increment was reasonable because in this situation, there is a finite number of kilometers involved, *i.e.* 1–24. Further, the range of distances used by Commerce to value truck transportation are in increments larger than 25 kilometers, so that there are 150 kilome-

---

**10.** At oral argument, Defendant took the position that the freight costs were calculated on a per kilometer basis, so that the freight cost for a distance of 2 kilometers was 500 rupees (2 times 250 RS/mt, see chart, *infra* ). Subsequently, Defendant submitted a brief retracting that position. United States' Brief, dated July 1, 1996. The freight costs were not calculated on a per kilometer basis. Instead, the actual weight of the input (sebacic acid) was multiplied by the rate per metric ton applicable to the appropriate range of

distances. For example, for an input transported a distance of between 25 and 100 kilometers, the freight cost would be RS 250 times the actual weight of the input expressed in metric tons.

**11.** The train rates were as follows:

(a) up to 500 km: RS154.00/mt
(b) up to 600 km: RS185.20/mt
(c) up to 700 km: RS216.50/mt
(d) up to 1,000 km: RS295.80/mt

ters between range (a) and range (b), 250 kilometers between range (b) and range (c), and 500 kilometers between ranges (c), (d), and (e). The Court finds Commerce's decision to value truck transportation distances of 101 kilometers for the same rate as 250 kilometers, according to the chart, to be reasonable, and consistent with its determination to value distances less than 25 kilometers at the same rate as distances of 100 kilometers. Therefore, the Court sustains Commerce's use of BIA for truck transportation.

## IV

## CONCLUSION

For the foregoing reasons, this matter is remanded to Commerce with instructions that Commerce value octanol–2 based on an appropriate cost of crude octanol–2, which may be the U.S. cost, rather than on the Indian selling price for refined octanol–1, and then recalculate the by-product/co-product determination with the correct value. Defendant–Intervenors' Motion For Judgment Upon Its Agency Record is denied.

## ORDER

This case having come before the Court for decision, and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that this case is remanded to the Department of Commerce with instructions to value octanol–2 based on an appropriate cost (which may be the U.S. cost) of crude octanol–2 rather than the Indian selling price for refined octanol–1, and then recalculate the by-product/co-product determination with the correct value; and it is further

ORDERED that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due; and it is further

ORDERED that Defendant–Intervenors' Motion For Judgment Upon Its Agency Record is denied; and it is further

ORDERED that all parties shall review the Opinion and notify the Court on or before August 19, 1996 whether any information contained in the Opinion is proprietary or confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter.